# EXHIBIT C

Richard Sollars, Jr.
12/20/2024

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION

SHANE ANDERS, STAR TOWING

AND RECOVERY, LLC, and AREA

TOWING AND RECOVERY, INC.,

        Plaintiff,

 -vs-               No:  2:19-cv-10989

                    HON. LINDA V. PARKER

                    MAG. ELIZABETH A. STAFFORD

TONY CUEVAS, in his individual

capacity as Post Commander for

the Michigan State Police; DARZEIL

HALL, in his individual capacity

as a Michigan State Trooper; RICK

SOLLARS, in his individual capacity

as an elected member of the Taylor

City Council; and RICH SOLLARS, in

his individual capacity as the

elected Mayor of the City of Taylor,

        Defendants.

_____/

Pages 1 - 86.



HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

**Page 2**

The deposition of RICHARD W. SOLLARS, JR.

taken at 101 West Big Beaver Road, 10th Floor,

Troy, Michigan,

commencing at 9:06 a.m.

Friday, December 20, 2024

before Ann L. Bacon CSR-1297.

ALSO PRESENT:  MR. SHANE ANDERS

MR. ROBERT DAVIS

**Page 3**

APPEARANCES:

MR. JAMES R. AUSTIN (P43400)

Corcoran Austin, P.C.

6880 Thayer Lake Road

Alden, Michigan 49612

(248) 909-4752

jaustin@jaustinlaw.com

Appearing on behalf of the Plaintiffs.

MR. GEOFFREY S. WAGNER (P70839)

Giarmarco Mullins & Horton, P.C.

101 West Big Beaver Road, 10th Floor

Troy, Michigan 48084

(248) 457-7000

gwagner@gmhlaw.com

Appearing on behalf of Defts. Sollars and Sollars.

MR. ERIC M. JAMISON (P75721) (Not Present)

Assistant Attorney General

State Operations Division

P.O. Box 30754

Lansing, Michigan 48909

(517) 335-7573

jamison@michigan.gov

Appearing on behalf of Defts. Cuevas and Hall.

**Page 4**

T A B L E   O F   C O N T E N T S

| WITNESS | PAGE |
|---|---|
| RICHARD W. SOLLARS, JR. | |
| Examination by Mr. Austin | 4 |
| Examination by Mr. Wagner | 82 |
| Re-examination by Mr. Austin | 84 |

E X H I B I T S

| NUMBER | PAGE |
|---|---|
| Deposition Exhibit No. 1 | 25 |
| (11/14/16 Request for Proposal) | |
| Deposition Exhibit No. 2 | 33 |
| (3/23/18 Letter) | |
| Deposition Exhibit No. 3 | 33 |
| (3/20/18 Council Meeting Minutes) | |
| Deposition Exhibit No. 4 | 43 |
| (1/22/17 Detroit Free Press Article) | |
| Deposition Exhibit No. 5 | 61 |
| (8/22/23 Plea Agreement) | |
| Deposition Exhibit No. 6 | 68 |
| (City of Taylor Resolution) | |
| Deposition Exhibit No. 7 | 72 |
| (2/20/19 The Detroit News Article) | |
| Deposition Exhibit No. 8 | 77 |
| (5/28/24 Herman "Butch" Ramik Subpoena) | |

**Page 5**

Troy, Michigan
Friday, December 20, 2024
9:06 a.m.
- - -

RICHARD  W.  SOLLARS,  JR. was thereupon called as a witness herein, after having been first duly sworn to tell the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

EXAMINATION

BY MR. AUSTIN:

Q.  Can you state your name for the record please?

A.  Sure.  Richard Wayne Sollars, Jr.

MR. AUSTIN:  Let the record reflect that this is the deposition of Richard Sollars taken pursuant to Notice and for all purposes under the Federal Rules of Civil Procedure.

Q.  (Continuing, by Mr. Austin) Have you had your deposition taken before?

A.  Yes, I have.

Q.  So you know the rules, but I'll go through them anyway.  Ann here is taking down everything that we say, so wait until I'm done with my questions and then answer.  She loves nods of heads, but can't take them down.  If at any time I have a

Richard Sollars, Jr.
12/20/2024
Pages 6..9

Page 6

question that you don't understand or needs clarification, please let me know and I'll restate it, okay?

A. Okay.

Q. What's your home address?

A. 22190 Hunter Circle North, Taylor, Michigan.

Q. How long have you been a resident of Taylor?

A. Pretty much my whole life.

Q. Okay. Are you married?

A. Yes, I am.

Q. And your wife's name?

A. Alicia.

Q. Are you currently employed?

A. No, I'm not.

Q. Okay. At some point you were mayor of the City of Taylor, is that correct?

A. That is correct.

Q. And when did that start?

A. November of 2013.

Q. Was that your first political office, elected political office?

A. First elected political office. I was appointed prior to as city council.

Q. For the City of Taylor?

A. Yes.

Page 7

Q. And how many years did you serve on there?

A. So it was two partial terms of I think approximately three years each term.

Q. Okay. So when did that start?

A. I believe around 2006.

Q. Okay. And did you stay on council until you got elected mayor?

A. So the first term when it ended, I was not elected to city council, so there was a gap and then I was re-appointed to city council and then I remained on city council until my term, until I was elected mayor.

Q. Okay. Were there elections in between?

A. I'm sorry?

Q. Were there elections in between? I'm trying to figure out how this process worked.

A. Yes.

Q. Maybe you can tell me how that works, that you get appointed, gap, and appointed with no elections in between just to set that up?

A. Yeah, so there were elections in between, but I was not elected, so that's why there was a gap. So there was essentially the second term somebody had resigned and then I was re-appointed back to city council.

Page 8

Q. Okay. And then in your second time as appointed city council, did you do that up until the time you were elected mayor?

A. Yes, I did.

Q. Okay. It's a different route.

A. Yes, it is.

Q. Can you tell me -- we'll start broad -- the roles of the city council and you as a city councilman and then the roles of the administration and how those two worked together for the City of Taylor? Where the power is, you know, who has the decision-making power and for what things? Is that too broad a question or can you --

A. I could probably answer, just it may be a little bit of a broad answer.

Q. That's okay.

A. Essentially the city council is the legislative body that votes to approve or deny items brought forward by the administration, and as mayor, those items were brought forward by the administration for city council to consider.

Q. Okay. And does that mean city council has the last say?

A. City council has voting authority.

Q. Okay. Voting authority. So if a decision is

Page 9

made by city council in your position as mayor, do you have the ability to override that?

A. Could you clarify the question, like what do you mean?

Q. Say city council passes a resolution. You as mayor don't think that's the best thing for the City of Taylor. Do you have a way to make it so that resolution does not go through?

A. Well, there is, if you're asking is there like veto authority?

Q. Sure.

A. Yes, sure, as mayor.

Q. Okay. And how does that work?

A. You would bring forward a veto to city council of whatever item was being considered.

Q. Okay. And is that then the last stop?

A. City council has the authority to override the veto.

Q. Okay. So you started as mayor in November 2013?

A. That is correct.

Q. How long did you remain mayor?

A. I completed four terms and then ran again and completed, or I'm sorry, not four terms. Four years, and then ran again and completed those four years, so eight years total as mayor.


HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

Richard Sollars, Jr.
12/20/2024                                        Pages 10..13

Page 10

Q. Okay. During your time as mayor, did you have -- did you do political fundraising?

A. Yes.

Q. And did you hold fundraisers?

A. Like --

Q. Events?

A. Yes.

Q. Did you have a Political Action Committee?

A. I think in the second term towards the end I did.

Q. Okay. And what was the purpose of that? What did that do for you?

A. It was -- I don't recall specifically, but it was to -- I don't know how to answer the question. It was for the purpose of general support of other issues or items or actions that were downriver and in the City of Taylor.

Q. Okay. So how would funds be used that were raised by the Political Action Committee?

MR. WAGNER: I'll object to the form of the question as vague.

Q. (Continuing, by Mr. Austin) Okay. Can you answer it that way?

A. They would be used to support -- there was at some point a charter vote that was being considered and I don't remember if my Political

Page 11

Action Committee supported that or not, but that would be a type of support that it may consider.

Q. Okay. Did you have a Candidate Campaign Committee?

A. Yes, I did.

Q. Okay. And was that established under the guidelines of the Michigan Campaign Finance Act?

A. Yes.

Q. Okay. And were all the donations and expenditures recorded?

A. To the best of my knowledge.

Q. Okay. During your tenure as mayor, did you contact vendors of the City of Taylor and request that they contribute to either your Political Action Committee or your campaign?

A. They would have likely been sent an invitation.

Q. Okay. And that would be an invitation to donate?

A. To the event, whether it was a golf outing, that type of thing.

Q. Okay. And how many events would you hold a year?

A. Most of the time it was one. I think in two, maybe three of the years there were two.

Q. Okay. And what were those events?

A. There would have been the golf outing and there was a cigar event later.

Q. Okay. I don't know what a cigar event is. Can

Page 12

you fill me in and how does somebody contribute and what happens?

A. It would have been like a cocktail type reception and similar to the golf outing, just minus the golf.

Q. Okay. Where was the golf outing held?

A. Lakes of Taylor and maybe Taylor Meadows.

Q. Those are the two Taylor-affiliated golf courses?

A. Correct.

Q. Okay. And would that be the same with the cigar event?

A. I believe so, yes.

Q. You're familiar with Area Towing?

A. Yes.

Q. So you started on city council in 2006, which is approximately the time that Area Towing started towing for the City of Taylor, is that correct?

A. I'm not 100 percent sure when their contract was started.

Q. Okay. Do you remember --

A. They were already there when I was appointed to city council.

Q. Okay. And are you familiar with the contract that they had while you were on city council?

A. I was. It's been a while since I've looked at it, but I was familiar with it.

Page 13

Q. Okay. Is there any money paid from the City of Taylor to a towing vendor?

A. Not that I recall.

Q. Okay. At some point during your terms on city council, did you have any issues with Area Towing or the towing company for the City of Taylor?

A. Personally? I did not have any issues with Area Towing.

Q. As a council person?

A. No. I mean we received complaints from residents, but I mean I didn't have any personal issues with them.

Q. What kind of complaints did you receive?

A. Just usually it was economic driven, price, the cost that they were being charged.

Q. Okay. How did you as a council member react to those, those complaints from -- were they from -- strike that. Were these complaints from citizens of Taylor or from people who had been towed by Area Towing that were not in the City of Taylor or both?

A. I don't have the specifics, but as I recall, they were both, both residents and non-residents.

Q. Okay. And how did these complaints get to you as a council person?


HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

Richard Sollars, Jr.
12/20/2024                                    Pages 14..17

Page 14

A. They may have been verbally communicated. They may have been somebody that came to a council meeting. They may have been somebody that came to the city council office. They may have been something that was sent over an e-mail. Again, I don't remember specifically. I do remember just generally speaking that those would be the type of avenues that they would have complained.

Q. Okay. And what would the council do in response to those complaints?

A. Typically we would likely reach out to the police department to verify what took place and were they accurate charges.

Q. And what did you usually find out from the police department?

A. I don't recall specifically. I would only be speculating because there is not a specific instance that I can point to and say this is what happened.

Q. Okay. Are you familiar with the towing laws in regards to police towing in Michigan?

MR. WAGNER: Object to the form of the question. It's vague. Answer if you can.

A. Not today I'm not.

Q. (Continuing, by Mr. Austin) Okay. Do you know

Page 15

if they've changed since?

A. I don't know.

Q. Okay. Do you know of the process that's set up in the Michigan statutes for a vehicle owner to contest either the reasonableness of fees or the procedure that was taken in removing their vehicle?

A. I'm not, not today.

Q. Okay. How about then?

A. Again, I may have been. I would have likely been a little more in tune at that point in time but like today, I don't have those. I'm not familiar.

Q. Okay. So you -- there's a system set up in the statutes that allows a vehicle owner to contest filing a petition with the district court the reasonableness of the fees or the abandonment procedure. Are you familiar with that or not?

A. I'm not.

Q. Okay. So I can assume from that answer that you didn't direct anybody who came with a complaint regarding either the procedure or the reasonableness of the fees to follow the statute and take that up with the court?

MR. WAGNER: Hold on. Objection, form, foundation, also seeks a legal conclusion.

A. Yeah, I wouldn't know back then.

Page 16

Q. (Continuing, by Mr. Austin) Okay. How about when you were mayor?

A. Again, I don't specifically, I can't say that I recall.

Q. Okay. In -- so around 2016 did you start -- strike that. Did you ever have any issues with Area Towing where you wanted them removed from the towing for the police for the City of Taylor?

A. No.

Q. Did you have a time where as mayor you wanted the system changed?

A. The system, the towing system?

Q. Yes.

A. There were changes that we wanted to see happen, yes.

Q. And what was the reason for wanting those changes?

A. I think looking at comparisons to other communities and what they were doing and how they were doing it, I thought there were opportunities that we could do better.

Q. And what were those opportunities?

A. Again, specifically, I don't know sitting here today.

Q. Okay. What did you see that Area Towing was doing that needed to be done differently?

Page 17

A. Again, I don't know, sitting here today, I don't know if I can answer that question clearly. There were changes that I thought would benefit both the City of Taylor and Area Towing to make sure that everybody knew what was expected and residents as well.

Q. And was Area Towing approached about those changes to see whether they could be implemented?

A. Not by me they weren't. I don't know about the police department.

Q. Okay. How did you as mayor go about wanting to -- or how did you as mayor go about trying to implement these changes?

A. We would have put the recommended changes into the RFP so that when it was bid out, everybody would have known what they were bidding on.

Q. Okay. You're talking about an RFP as a request for proposals?

A. Yes. I don't know if it was an RFP or an RFQ, but one of the two, whenever that was.

Q. And the RFQ is a request for qualification, for the record?

A. Yes.

Q. Okay. Was there a process started for that? Let's start with a request for qualifications or

Richard Sollars, Jr.
12/20/2024                                          Pages 18..21

Page 18

request for proposals.  Was there a process started by either the city council or you to put out a new RFQ or RFP for towing?

A.   Yes, there was.

Q.   And did you initiate that?

A.   I did initiate it.  It would have been initiated through purchasing.

Q.   Okay.  Did you have any influence over purchasing in starting that or did they initiate it?

A.   I don't recall specifically, but I mean it's possible that I would have had input, but it would have been handled by purchasing.

Q.   Okay.  And if you know, what did purchasing do?

A.   I believe there was an internal working group that they had representatives.  Again, I don't know specifically, but I believe it was a representative from police, fire and DPW that helped structure the RFP.

Q.   Was that the tow work group or towing work group?

A.   I don't know if it was ever called anything, but that may have been what it was referred to.  I'm not 100 percent sure.

Q.   Did it have council members on it as well?

A.   Not to my knowledge.

Q.   Okay.  They didn't have Dan Bzura, for example,

Page 19

was not a member of the group?

A.   Not the internal group that was working on the RFP or RFQ.

Q.   Okay.

A.   I believe there may have been something started prior to that by the former police chief that may have had council members, but I'm not 100 percent sure.

Q.   And who was that former chief?

A.   Mary Sclabassi.

Q.   Do you want to spell that for her?

A.   I'll try.  S-c-l-a-b-a-s-s-i?

MR. AUSTIN:  That's close.  We'll get it for you.

MR. WAGNER:  I think that's right, by the way.

MR. AUSTIN:  You've passed spelling.

Q.   (Continuing, by Mr. Austin) What was the, if you know, what did the work group do to get to the RFP?

A.   I'm not sure.  I didn't even know they were meeting.  I had no idea that this was even taking place at the time.

Q.   So at what point did you become aware that an RFP was being considered?

A.   I don't think I was ever aware that an RFP was

Page 20

being considered.  I think after the fact when we sent out, we being the City of Taylor, sent out the RFP, there was objections or input from another council member and they had indicated -- he had indicated that he participated in a work group and I was not aware of it though.

Q.   And who was that other counsel member?

A.   Alex Garza.

Q.   Okay.  So is this another work group other than the one that purchasing put together?

A.   Again, I don't know what it was.  I had no knowledge of it when it took place.

Q.   Okay.  Do you know who the members of that work group were?

A.   I do not.

Q.   Okay.  You just know that Alex Garza was one of them?

A.   That is correct.

Q.   Did either of those work groups give a report to city council or administration regarding their process before the RFP came out?

A.   I don't recall.

Q.   Was Area Towing doing both regular duty and heavy duty towing for the City of Taylor?

A.   It seemed like they were doing both and they may

Page 21

have been contracting out stuff that they couldn't do.

Q.   And by something they couldn't do, things that they didn't have the equipment for?

A.   Yeah, I suspect, or maybe beyond their capacity if it was a busy day.  I don't know.

Q.   And is it within their contract with the City of Taylor, is that acceptable to subcontract?

A.   I don't recall.  It's been a long time since I looked at that contract.

Q.   Geoff didn't have you review it for this?

A.   I barely spelled the police chief's name right.

Q.   At some point did you request that another tow company do the heavy duty towing for the City of Taylor?

A.   In regards to like the RFP or the RFQ?

Q.   No, just for prior to that.

A.   No.

Q.   Okay.  Well, in regard to the RFQ or RFP, did you?

A.   No, I believe we had, the recommendation was for two vendors to be considered.

Q.   Okay.  Did you ever approach -- do you know who Shane Anders is?

A.   Yes.

Q.   Is he the owner of Area Towing?



HANSON RENAISSANCE
COURT REPORTERS & VIDEO

hansonreporting.com
313.567.8100

Richard Sollars, Jr.
12/20/2024
Pages 22..25

Page 22

A. As far as I know.

Q. Did you know Mr. Anders during your term as council person?

A. Yes.

Q. Did you get along with him?

A. Yeah.

Q. What was your working relationship with him, if you had one?

A. It was fine. I didn't have any issues.

Q. How about as mayor?

A. Yeah, I mean it wasn't as -- I didn't interact with him as frequently, but I didn't have any issues with him.

Q. Okay. Was there a time where you requested that Shane Anders and Area Towing use Boulevard & Trumbull as heavy duty towing?

A. No.

Q. Did you ever talk with anyone at Boulevard & Trumbull about providing heavy duty towing for the City of Taylor?

A. No.

Q. Do you know who Gasper Fiore is?

A. I do.

Q. Do you know him as the owner of Boulevard & Trumbull?

Page 23

A. I believe so. I don't know what the ownership structure was, but I believe that's how he identified himself.

Q. Okay. How do you know Gasper Fiore?

A. Just casually, like very casually.

Q. Was he a donor to either your campaigns or your funds?

A. Probably. I don't know specifically for sure, but likely he would have attended one or many events. I don't know.

Q. Is there a way we can find that out? Do you have records?

A. You could probably pull it from the Wayne County campaign finance site.

Q. You don't have those on your own?

A. I don't have them, no.

Q. So I'm taking from your testimony that you never told Mr. Anders that he needed to use Boulevard & Trumbull as heavy duty tower?

A. No.

Q. Did you at any time either recommend or require Mr. Anders to use any other towing company for any other towing service for the City of Taylor?

A. No, I don't know who Mr. Anders used for any other towing services.

Page 24

Q. Did you ever -- we're get going to get you to spell her name again. Did you ever have any conversations with Chief Scalbassi regarding heavy duty towing for the City of Taylor?

A. No, not that I recall.

Q. Did you ever mention Boulevard & Trumbull to her?

A. I did not.

Q. Did she ever talk about Boulevard & Trumbull to you?

A. She may have. I don't remember specifically, nothing that like that I recall, but it's possible.

Q. If I were to tell you that in her deposition Miss Scalbassi testified that she talked with you about using Boulevard & Trumbull, would you question that?

A. She may have. I don't recall her talking to me about it, but we're talking about ten years ago.

Q. So back to the RFP for towing. Can you tell me how that was set up? What were the changes going to be or how was it going to be bid out?

A. Yeah, I can't tell you the changes. I don't know. Again, that was I think 2016 or 2017, so seven, eight years ago, but there was, as I mentioned, a handful of individuals that participated in structuring it and then I think

Page 25

the police department did background checks on the participating bidders and based on that there was a point system that was concluded and the recommendation was made to city council based on that point system.

Q. And what was that recommendation, do you remember?

A. I don't recall specifically, but I believe there were two, maybe three vendors that were being recommended for consideration.

MR. AUSTIN: You can mark that one as Exhibit 1.

MR. WAGNER: Thank you.

(Marked Exhibit No. 1.)

Q. (Continuing, by Mr. Austin) Can you take a look at that and tell me what that is if you can?

A. It appears to be the document for police-related towing for the City of Taylor.

Q. And is this the RFP we have been talking about?

A. It appears that way, yeah.

Q. Do you know if there was another version prior to this one or after this one?

A. I don't recall.

Q. And did you have any -- did you take part in any of the structuring of this or the terms that went into it? Did you have any requirements

Richard Sollars, Jr.
12/20/2024
Pages 26..29

Page 26

regarding this?

A. Not that I, I mean not specifically. I'm sure I reviewed it at some point in time, or had some kind of summary to it, but I don't remember specifically ever adding anything or removing anything on this RFP.

Q. Do you know what -- so you've said that the bidders came in on it, on this RFP, and they were vetted somehow. Can you tell me again how they were vetted?

A. I believe the police department conducted a background investigation as well as a site inspection that, again, I don't recall if it was just the police department or if the other fire and DPW had some level of participation as well. They may have.

Q. Okay. Which department works closest with the towing that goes on for the City of Taylor?

A. Which department within the City of Taylor?

Q. Right.

A. The police department.

Q. Okay. Was the police department first and foremost in developing this RFP?

A. I don't recall.

Q. Okay. Do you think they should have been?

Page 27

A. They should have had input.

Q. Okay. Did Chief Scalbassi have issues with Area Towing that she conferred to you?

A. I don't recall, and I don't want to speculate.

Q. Okay. But there was nothing glaring? It sounds like she didn't come out and say, "Holy cow, we've got to get rid of Area Towing."

A. I can't confirm or deny that she ever said that, no. She may or may not have, I don't know.

Q. Are you saying she didn't start with holy cow?

A. I don't know if she had any issues with Area Towing or not. I don't know that she ever confided anything to me one way or another.

Q. Either as a council person or as mayor?

A. Well, I think there were -- I think she recognized changes that should happen, but I don't know if it was, you know, holy cow we need to do this.

Q. And what were those changes?

A. I don't recall specifically.

Q. Did you agree with her?

A. Again, there is just nothing specific that I recall, so I don't know if I would agree with her or not.

Q. Okay. Did you think a change had to be made?

A. To the contract or --

Page 28

Q. To the vendor, should there be a different vendor?

A. I didn't have any issue with the vendor one way or another.

Q. Did you think that the contract should have been bid out at that time?

A. Yeah, I believe that it was overdue to be bid out.

Q. Do you recall at what point in the contract Area Towing was? Were they in the middle of the contract? Was it coming to an end?

A. In 2016?

Q. Yes.

A. I believe it was at the end.

Q. Okay. What happened as a result of the RFP? The bid had been vetted. Then what happened?

A. I think the recommendation was made to city council and I believe Area Towing was one of the suggested vendors to be considered.

Q. And what happened then?

A. It was taken to city council and they, I don't remember if they voted on one or two vendors or if they voted for all three. I don't remember. I think there were three, maybe four. I don't remember.

Q. But as you sit here, you don't recall wanting to eliminate Area Towing as the vendor?

Page 29

A. I don't think a suggestion was ever to eliminate Area Towing.

Q. And you specifically?

A. No.

Q. Did you make a request that there be three tow companies as vendors?

A. No. I think our goal was to consider two. I don't recall why there were three.

Q. Was there a resolution passed by city council for two towers or three towers, do you recall?

A. It seems that there was a resolution for two, maybe two towers, but I don't recall, specifically I don't recall.

Q. Okay. Did you make in approximately 2018 -- and what's the time frame on this RFP? Do you know when it came out? I mean we're dated proposal date 2016 on this. Do you know the time period for how this played out?

A. I don't recall. It seems like it took longer than expected, but I don't recall.

Q. Okay. March of 2018, did you request an approval of three companies to do the towing to city council?

A. So if the police department's background check confirmed the three companies, it's likely that

Page 30

it was placed on the agenda for city council to consider, but I don't recall, but it seems like they only considered two.

Q. Do you know which two?

A. I don't. I don't even remember like who the companies that bid on it were.

Q. Okay. Was Area Towing one of them?

A. Yes, I know Area Towing was one of them.

Q. Was J & M Towing another?

A. It seems like they were one of them.

Q. Do you have any connections with J & M Towing? Do you know anyone there?

A. Like am I friends with somebody there?

Q. Sure.

A. I knew the owner that passed away.

Q. Darrel Jamison?

A. Just casually, yes.

Q. Was he a contributor to your campaigns or your PAC?

A. Again, I don't know specifically, but likely he would have attended one event somewhere along the way, but I don't know specifically.

Q. Do you know if Shane Anders contributed to your campaigns?

A. Again, likely at some point in time, but I don't know specifically.

Page 31

Q. Did the city or did the counsel have a vote regarding putting Area Towing in for a new contract during this process?

A. Could you ask that question again? I want to make sure I understand it.

Q. Sure. Let's step back. Did council ever approve the two vendor system for towing?

A. I believe they did. At some point in time they made a recommendation for two of the vendors to be considered.

Q. And was a contract drawn up for those two vendors?

A. I don't believe it was.

Q. Okay. Why not?

A. Because the duration of the contract that they were recommending exceeded both the bid specs and the purchasing policy timeline.

Q. So what were the bid specs?

A. I suspect they're here. I think it was a three-year contract though or maybe a one-year with two -- the total duration I believe was a three year contract. I don't know if it was two one-year extensions or just a three-year contract, but I believe it was three years in totality.

Q. If I told you that the previous Area Towing contract was an initial three years with two

Page 32

three-year extensions, would you agree with that?

A. I don't know.

Q. Okay. Do you know whether that was offered to Area Towing or as -- strike that. Do you know whether that type of contract, three years with two three-year extensions was on the table as a result of this RFP?

MR. WAGNER: Object to the form of the question, vague.

A. This RFP, I don't believe that was what was requested in the RFP I believe. That's what city council took it upon themselves to try to implement.

Q. (Continuing, by Mr. Austin) And did they have a resolution to pass that?

A. I believe so.

Q. Okay. And what did you do as a result of that?

A. I believe, again, I haven't looked at it in a long time, but I believe that's when the veto was issued.

Q. Okay.

MR. AUSTIN: Can you mark that as Exhibit 2?

MR. WAGNER: Can we go off the record for a minute?

Page 33

(Recess 9:49 a.m. to 10:00 a.m.)

(Marked Exhibit Nos. 2 and 3.)

Q. (Continuing, by Mr. Austin) Can you take a look at Exhibit 3 and can you tell me what that is?

A. It appears to be the minutes from the March 20th, 2018 city council meeting.

Q. Okay. And if you can go to the last page, and the second motion, can you read that and tell me what you recall about that?

MR. WAGNER: Can you be more specific and tell him which one?

Q. (Continuing, by Mr. Austin) I'm sorry. I thought I said the second one, the motion by Croft, supported by Woolley, resolved to approve Area Towing.

A. "Motion by Croft, supported by Woolley to approve Area Towing, Martin's Towing and J & M Towing for the City of Taylor Police Department towing services based upon the terms and conditions stipulated in the Request for Proposal (RFP)."

Q. Now those are the three towing companies, right? What do you recall about this motion?

A. That seems accurate.

Q. Okay.

A. I think there were others that submitted proposals,


HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

Richard Sollars, Jr.
12/20/2024
Pages 34..37

Page 34

but I don't remember why they weren't considered.

Q. Okay. But this one was for all three to provide towing for the City of Taylor, correct?

A. As I recall, it would have been for all three to be approved and then the police department would have used them how they see fit.

Q. And that's different than how it had been, correct?

A. Different in the sense that there was only one prior, that is correct.

Q. Okay. And what happened with that motion?

A. Motion not carried.

Q. And, in fact, it was unanimously not carried, correct?

A. According to this, that is correct.

Q. Even by the person who brought it and supported it?

A. It appears that way, yes.

Q. Can you take a look at the next one?

A. The motion by Croft, supported by Bzura?

Q. Yes.

A. Okay.

Q. And do you recall that motion?

A. I mean I recall the motion, not specifically, but generally speaking, yes.

Q. Generally what were they bringing forward?

A. Do you want me just to read it?

Page 35

Q. Sure, that would be fine.

A. "To approve Area Towing for the City of Taylor Police Department towing services and to direct the administration and negotiate a contract with Area Towing to be brought to City Council for approval. Contract terms shall be for an initial period of (3) three years with (2) two (3) three-year extension options to be approved only with City Council approval. J & M Towing shall be listed as the sole Heavy Duty Sub-Contractor within the Area Towing contract to be negotiated by the administration."

Q. And that one passed, correct?

A. It appears that it was a five to two vote.

Q. So that one would have given Area Towing a contract for three years with two three-year extensions along with J & M as the heavy duty for three years with two three-year extensions. Is that how you read it?

A. That appears accurate.

Q. Is that how you remember it?

A. Again, it was a while ago, but generally speaking, yes.

Q. Okay. And is that what happened?

A. Well, what do you mean is that what happened?

Page 36

Q. Was the contract issued?

A. It was not, no.

Q. And why was that?

A. Because the veto occurred.

Q. Now we'll get to number two. Can you take a look at Exhibit 2 and tell me what that is?

A. This is the veto of that city council resolution.

Q. And why -- this is a veto by you, correct, as mayor?

A. Correct.

Q. And why did you veto?

A. Because it was the time frame extended beyond what was bid out in the RFP as well as the purchasing policy.

Q. What's the purchasing policy regarding this?

A. I believe, again, my memory is that I think it was three years.

Q. A contract could only be for three years with no extensions?

A. It could be for three years unless there's an economic benefit to the City of Taylor. Generally speaking, I think that's what it states.

Q. Okay. And what would be an economic benefit in terms of a vendor contract?

A. Well, I think if there's longer period contracts

Page 37

with reduced pricing to the City of Taylor, those types of things.

Q. And in this case there is no pricing that the City of Taylor has to be worried about, correct?

MR. WAGNER: Object to the form of the question. Answer if you can.

A. To the City of Taylor directly, no, but to the residents there is, yes.

Q. (Continuing, by Mr. Austin) How so?

A. Well, there's a cost for their vehicle to be towed.

Q. Okay. And is that something that's confined to a three-year thing or how does that play in?

A. I don't know that it's confined to a three-year thing. You just asked if there's a cost.

Q. Okay. But not to the City of Taylor itself?

A. Not directly to the City of Taylor, correct.

Q. Does the purchasing policy say anything about benefits to the residents of the City of Taylor?

A. I don't recall specifically.

Q. Would you agree that there's a difference between a benefit to the City of Taylor and the residents of the City of Taylor or is that the same thing?

MR. WAGNER: I'll object on the grounds that it calls for an inadmissible lay opinion.



Richard Sollars, Jr.
12/20/2024
Pages 38..41

Page 38

Answer if you can.

A. Could you re-ask the question again?

Q. (Continuing, by Mr. Austin) Maybe. As you interpret the purchasing department policy regarding this that we have been speaking about, is there a difference between the City of Taylor as a benefiting party and the residents of the City of Taylor as a benefiting party?

MR. WAGNER: Same objection, also calls for a legal conclusion.

A. I think there's a difference in terms of who is paying for it, the City of Taylor or the residents of the City of Taylor, but I don't know that the purchasing policy identifies that as an exception.

Q. (Continuing, by Mr. Austin) Do you know of any other contracts for vendors for the City of Taylor that would consider what the residents are paying as regard -- as opposed to what the city is paying the vendor?

MR. WAGNER: Objection, vague.

Q. (Continuing, by Mr. Austin) Answer if you can.

A. Yeah, I'm not sure I understand.

Q. Let me see if I can un-vague it. Let's go this way. In your opinion as former mayor, former counsel person who has a working knowledge I

Page 39

would assume of the purchasing policy, is the policy that you are referring to directed toward financial benefits for the administration of the City of Taylor as opposed to for the residents of the City of Taylor?

A. Again, I don't think it speaks to the difference. I don't think there is a differential. I think it just generically states that it's limited to a three-year term unless there is an economic benefit.

Q. Do you know whether this was the same purchasing policy that was in effect in 2006 when you started as council person?

A. I don't believe so.

Q. You think it was a different policy?

A. I believe so. I think it was adopted sometime after that.

Q. Any idea when?

A. No. Probably 2014, 2015, but again, that is a guesstimate.

Q. Were you a part of that process?

A. The purchasing policy?

Q. Yeah, the change in the purchasing policy.

A. Probably had input in it, yes.

Q. Do you recall what changes were made?

Page 40

A. I don't.

Q. Was that three-year contract only except if it's a benefit to the city added?

A. I don't recall.

Q. When you -- was your veto based solely on the purchasing policy or did you have other reasons as well for that veto?

A. I believe it was solely based on the time frame of the potential nine years and how it relates to the purchasing policy.

Q. And you think that purchasing policy was changed in 2014-ish? I won't hold you to that.

A. I believe it's somewhere along that time frame.

Q. Okay.

A. Because if I may clarify.

Q. Please do.

A. The rationale, our new budget and finance director came in I think in 2014 and I believe he's the one that spearheaded the changes to the policy.

Q. Okay. When you started as mayor, who was doing the waste management for the City of Taylor?

A. Are you talking about the residential garbage pickup?

Q. I think so, yes.

A. It was -- I can't remember the company name.

Page 41

Paul Ruthenberg was the owner. I don't recall his company name.

Q. Okay. At some point during your term as mayor, did that change?

A. Yes.

Q. Okay. Go ahead.

A. It changed. I don't recall when though.

Q. Okay. Do you recall how and why it changed?

A. I don't. I know that Paul was getting out of the garbage business and I don't recall the specifics if he -- I don't know if he dissolved his company, if he sold his company, I don't recall the specifics, but it did change at some point in time.

Q. Do you remember what type of contract Paul was under?

A. No, I don't.

Q. Okay. Another company came in to do it?

A. That is correct.

Q. And how did that occur? Was there a bidding process?

A. It was not. There was a -- I don't remember if they acquired it, if the contract was transferred to them. I don't recall the specifics.

Q. Did the city have anything to do with it?

HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

Richard Sollars, Jr.
12/20/2024
Pages 42..45

Page 42

A. City council would have had to approve it, yes.

Q. Did you have anything to do with it?

A. You mean in terms of bringing it forward or restructuring the contract?

Q. Either one.

A. Likely.

Q. Do you recall what role you played?

A. I don't, no.

Q. Do you remember who came in?

A. The company that replaced them?

Q. Yes.

A. It was Rizzo.

Q. And do you know the terms of the contract that they came in on?

A. I don't know. I don't recall.

Q. If I were to tell you it was a three-year contract with three-year extensions, two three-year extensions, would you say that was wrong?

A. Could be.

Q. As mayor, would you have looked at that contract and vetted that process of one vendor taking over for another without a bid?

A. I think that was handled mostly by corporation counsel.

Q. Okay. Did you find it odd that it didn't go out

Page 43

to bid?

A. I don't remember. The circumstances were unusual as the City of Taylor at the time owned the garbage trucks and they were being operated by a private vendor, and so there was an acquisition of the garbage trucks that had to occur by Rizzo as they came in, so there were some unusual anomalies to that deal that were different than most.

Q. Okay.

(Marked Exhibit No. 4.)

Q. (Continuing, by Mr. Austin) I'm showing you Exhibit 4, which is a Detroit Free Press article from January of 2017.

A. Okay.

Q. And it talks about what we have just been talking about, the take-over of Rizzo on that, and if you look at the fifth page, fourth page, sorry, second full paragraph, can you read that?

A. Which one? I'm sorry.

Q. Second full paragraph. There's a little one at the top, but starts with, "The council approved."

A. Am I on the wrong page? What page did you say?

Q. Go one back.

A. One back?

Page 44

Q. Yes.

MR. WAGNER: Four of six at the bottom right-hand corner.

MR. AUSTIN: Yeah.

A. Okay. "The council approved," that part?

Q. (Continuing, by Mr. Austin) Yes.

A. "The council approved the switch on a 5-2 vote with Woolley and Bzura voting no. The deal is three years long with two three-year options to extend it. Those options would have to be approved by city council before they're exercised. If all three options are approved, GFL stands to make almost $20 million on the deal."

Q. And does that refresh your memory at all about the terms of the contract?

A. No, I mean if that's what it says, then that's what it is.

Q. You don't dispute that that's what they were?

A. No.

Q. And were you there during that 5-2 vote, do you recall?

A. Yes, I would have been there.

Q. Did you have any opinions on that that were expressed during it?

A. I don't remember. I mean I'm sure that I spoke

Page 45

about it.

Q. Did you veto this contract?

A. I don't believe so.

Q. Okay. And this in 2017 would have been after the changes in the purchasing policy, correct?

A. Correct.

Q. And so this would have been a contract similar to the one that had been proposed for towing that would have been three years with two three-year extensions, correct?

MR. WAGNER: I'll object to the form of the question, assumes facts not in evidence. Answer if you can.

A. I think that the only similarities would have been that component. There were so many other differences to the two proposed contracts.

Q. (Continuing, by Mr. Austin) Okay. But as far as length goes?

A. As far as length goes, likely.

Q. Okay. And your veto of the towing contract was because of the length, correct?

MR. WAGNER: Objection, form, misstates prior testimony.

A. Length related to the purchasing policy, correct.

Q. (Continuing, by Mr. Austin) Okay. How does the



HANSON RENAISSANCE
COURT REPORTERS & VIDEO

hansonreporting.com
313.567.8100

Richard Sollars, Jr.
12/20/2024
Pages 46..49

Page 46

length of the, what do I call it, a trash contract?  Help me.

A.  Curbside pick-up.

Q.  How does the length of the curbside pick-up that was approved contract differ from the one that was proposed for towing?

A.  The length doesn't differ, but again, the City of Taylor had purchased I think it was six, maybe eight garbage trucks, and also I think around $6,000,000 in garbage cans and so the economics of trying to find a good fit for that liability was the struggle for the City of Taylor, so somebody had to assume the debt on those vehicles, and Rizzo was the only one that was willing to do that at that time.

Q.  Without putting it out for bid you knew that?

A.  There was some negotiation with other companies with corporation counsel, as I recall.

Q.  Who was corporation counsel?

A.  Gus Andreasen.

Q.  Was there ever an issue with the ownership of Rizzo after this?

A.  An issue in what regard?  With the City of Taylor?

Q.  Let's start with the City of Taylor.

A.  Not that I'm aware of.

Page 47

Q.  Who is the owner of Rizzo?

A.  I don't know if it was Chuck Rizzo or his father or if it was other individuals, I'm not sure.  I think Chuck Rizzo represented himself as the managing partner.  I don't know if that means he owned it or not.

Q.  Okay.  Back up a minute to a question that was in my head, but I didn't say it.  Did you veto the or did you issue a veto for the curbside trash pick-up contract?

A.  No, I think you did ask me that.

Q.  Okay.  Getting a little older.  Did anyone of those Rizzos make contributions to your political campaigns?

A.  Likely.

Q.  And, again, we can find that out looking at Wayne County records?

A.  Yes.

Q.  Did you have any contacts with Chuck Rizzo?

A.  Very limited.  I met Chuck I think one time prior to the item going forward to city council.

Q.  Okay.  How did you get to know him?

A.  They had a government liaison that worked for them that brought him into my office for a meeting and I don't recall his name.

Page 48

Q.  Okay.  Nothing to do with Gasper Fiore?

A.  No.

Q.  Can you take a look at the last page?

A.  Last page?

Q.  Yes.

A.  Page five?

Q.  Where you were hanging out a while ago.

A.  Yes.

Q.  And read through that for me please.  Actually, if you could read it out loud, that would be great.

A.  Just from the top down?

Q.  Sure.

A.  "Woolley received $500 in August, two months after his no vote.  Garza received $100 in 2013.  Councilwoman Angela Croft received $100 in 2013 and $200 in February, four months before she voted yes on the Rizzo deal.

'We may not always agree sitting up here, but I don't think anybody did anything illegal,' Woolley said.

Garza agreed, saying that he never saw any evidence of pay to play.

'We had no clue what was happening with other legal issues or the FBI investigation,' Garza said.  'If we would have had that knowledge,

Page 49

we would have put it out for bid.'

Croft did not return messages seeking comment.

Sollars acknowledged Rizzo's contributions to his campaign, but said the company never offered him anything illegal.

The city did approach other vendors about taking over the Midwest contract, but they all balked at buying the city's garbage trucks which still carried debt on them.  Rizzo agreed to buy them, Sollars said, adding that he never met Rizzo until late in the selection process.

'Chuck never as much as bought me a lunch.  We've never been to a ballgame together,' Sollars said.  'I've never heard of Chuck doing anything like this, until this news broke.'

Sollars said he understands how people would question the deal in light of what's happened to Rizzo since, but said residents have been happy with the increased service.  He said he hasn't been approached by the FBI or anyone else involved in the Rizzo investigation.

'I would have done things a lot different had I known what I know today,' he said.  'We're all learning the hard way on this

Page 50

one. We don't have anything to hide.'"

Q. Do you agree with what's there? Is it correct?

A. I think fundamentally correct.

Q. And do you know if Rizzo was indicted?

A. I believe he was.

Q. Do you know anything on that?

A. I don't recall, but I know that he was indicted in I think, I don't remember if he pled guilty or was found guilty, I don't recall.

Q. Okay. And at this time it says you hadn't been approached by the FBI or anyone else. After this article was written, which was January of 2017, were you approached by the FBI?

A. Regarding?

Q. In regards to this?

A. No.

Q. In regards to anything else?

A. Not related to the garbage contract at all, no.

Q. In regard to anything else though?

A. Regarding any, yes, regarding anything else, yes.

Q. What?

A. Regarding allegations they made about me?

Q. I'm asking you how were you approached by the FBI?

A. They were -- they approached me about allegations made unrelated to this.

Page 51

Q. Okay. What were those allegations?

A. They were general allegations about a housing developer in the City of Taylor.

Q. Okay. And what things were they requesting of you?

A. I'm going to have to plead the Fifth on the details.

Q. Okay.

MR. AUSTIN: Can we take a break for a second?

MR. WAGNER: Sure.

(Recess 10:27 a.m. to 10:42 a.m.)

Q. (Continuing, by Mr. Austin) You were indicted for crimes around 2019, is that correct?

A. Yes.

Q. Can you tell me about those?

A. I can't tell you about the details. I would have to still plead the Fifth on that.

Q. You entered a plea agreement on those, correct?

A. Correct.

Q. And you pled guilty?

A. That is correct.

MR. AUSTIN: Geoff, what's the basis for the Fifth?

MR. WAGNER: He has pled the Fifth on the advice of his criminal counsel because there are appellate proceedings in the works relative

Page 52

to the criminal case.

MR. AUSTIN: Are those for sentencing or because he entered a plea agreement? You're not the criminal attorney.

MR. WAGNER: I'm not the criminal attorney. What was related to me is what I answered on the record in response to your question.

Q. (Continuing, by Mr. Austin) With any questions that I ask you regarding the criminal case, is that the answer I'm going to get?

A. Yes, yes.

MR. AUSTIN: Geoff, there are obviously things that we're looking for that would have to do with that.

MR. WAGNER: I would suggest if you want to place your -- if you want to reserve the rights to take the issue up with the judge at a later date and time, I'm fine with that, but I would suggest that for the sake of expediency and given the upcoming surrender date, that you place that objection and then ask the questions that he is willing to answer today.

Q. (Continuing, by Mr. Austin) Okay. So if I go through each question, that's what I'm going to

Page 53

get, the same response?

A. Related to my case, yes.

Q. Yes.

MR. AUSTIN: Should I go through and ask them?

MR. DAVIS: Mm-hmm.

MR. AUSTIN: I have to get my list.

Q. (Continuing, by Mr. Austin) Back to Exhibit 4, can you read the second paragraph please?

A. On page one?

Q. Yes, starting with, "Mayor Rick Sollars."

A. "Mayor Rick Sollars, who negotiated the deal and urged the Taylor City Council to approve it, acknowledges that the firm's political action committee was his most generous political donor, giving his campaigns $9,750 since 2013. But Sollars insists he never saw the signs of the bribery the company is accused of using to expand its empire."

Q. So looking at that, is there anything that's incorrect about that paragraph?

A. I did not verify how much was donated politically, but assuming that that amount is correct, yeah, I mean it appears correct.

Q. And so Rizzo Environmental Services or somebody

Richard Sollars, Jr.
12/20/2024                              Pages 54..57

Page 54

involved with them was your biggest campaign contributor?

A. Again, I don't know that part. That's what they wrote, but I'm assuming that the amount is correct.

Q. Okay. It says you acknowledged. Did you acknowledge that to this reporter?

A. I have no idea.

Q. As a part of your criminal case, did you review documents that were provided to your attorneys?

A. I have reviewed documents, yes.

Q. Did you review any of the wire taps of Gasper Fiore?

A. I did not review any of the wire taps regarding Gasper Fiore.

Q. Did you know whether Gasper Fiore had been wire tapped?

A. I do not know.

Q. Do you know anything regarding Shane Anders and Gasper Fiore and an FBI investigation?

A. I do not know.

Q. What documents as a part of the criminal case did you review?

A. Regarding somebody specifically or just --

Q. Just what was made available to you for review?

A. I mean I don't know specifically other than just

Page 55

I mean there was a lot of discovery that was provided.

Q. Give me some for instances.

A. Again, I'd have to just plead the Fifth on it because I don't know the details and certain details I don't think they would want me to reveal.

Q. As to what you looked at, because I'm not asking for content right now. I'm asking you for what you looked at.

A. There was hundreds, if not, thousands of documents we looked at.

Q. What type of documents?

A. Interviews with individuals.

Q. Did you see text messages?

A. Text messages between who?

Q. As a part of those documents that you reviewed?

A. Some, minimal.

Q. Any from you?

A. From me like to my wife, yes.

Q. To anyone?

A. There wasn't a lot, no. I mean there was a lot of personal stuff.

Q. Were there any text messages between you and Robert Dickerson?

A. Probably or maybe not. It may have been the

Page 56

instant messenger. I don't know if there were a lot of text messages, but --

Q. But there were communications between you and Mr. Dickerson?

A. Likely.

Q. And can you tell me for the record who Mr. Dickerson was and is?

A. I don't know who he is now, but he was the chief of staff for the City of Taylor and the City of Romulus prior to that.

Q. Okay. And what were his duties as chief of staff? Was that for you or for the city?

A. Well, I think they're probably one in the same, but he was appointed by -- he was brought in by me, but he was chief of staff for the city.

Q. And what were his responsibilities?

A. He did a lot of the contract negotiations with the unions, a lot of the HR-related stuff for the city.

Q. Okay. Did you and he have conversations regarding the towing contract that we have been talking about?

A. We may have.

Q. Do you recall any of them?

A. No, not specifically.

Page 57

Q. Do you recall text messages with him?

A. I don't.

Q. Do you recall any text messages with him discussing Shane Anders?

A. I don't.

Q. Would you have access to those, your text messages, access to your text messages during that time?

A. I don't have access to them. My attorney probably does.

Q. Do you know who your provider was for your personal phone then?

A. I believe it was Verizon.

Q. Okay. And what was your personal phone number then?

A. (734) 626-6346.

Q. And did you have a city phone as well?

A. I did.

Q. And who was the provider for that?

A. I don't recall. I think that was also Verizon, and I apologize, but I don't recall the number.

Q. Do you know where we can find that?

A. The city would have it. I would probably suggest IT. They would likely be able to give you that number.


HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

Richard Sollars, Jr.
12/20/2024
Pages 58..61

Page 58

Q. Okay. Do you know if the city keeps copies of records from city phones, text messages, voice messages, things like that?

A. At some point they would have been on the server. I don't know if it's still there or not.

Q. But was it the practice at some point to keep it for some length of time, do you know?

A. I don't know so much about voice messages, but text messages, instant messages, I think most of that would have been available through the server at that point in time.

Q. Did you communicate with members of city council or your administration or anybody employed by the City of Taylor via text messages?

A. I'm sure.

Q. When you did that, would you do it on your personal phone or your city phone?

A. Could have been either/or.

Q. What would be a reason for using one or the other?

A. Likely whatever they had. Most of it would have been me responding, so depending on what number they had, I would have simply responded to the message. It would have been unlikely for me to say don't send it here, send it to this one instead. Does that make sense?

Page 59

Q. Yes.

A. Okay.

Q. Back on the Rizzo contract, was the reason that you didn't veto that because they were a contributor to your campaigns?

A. No.

Q. Was Shane Anders a contributor like Rizzo?

A. I don't recall how much either contributed, but I suspect that Shane Anders contributed at some point in time.

Q. Do you know that?

A. Do I know what, that he contributed?

Q. That he contributed?

A. I'm sure he did. How much I don't know, I'm sorry.

Q. Did you ever ask him to contribute and he said no?

A. Not that I recall, but it's possible, but I don't recall that.

Q. Would whether someone contributes or not to your campaign if they are a potential vendor make any difference in how you treat them during a bid process or a non-bid process?

A. Would make no difference whatsoever.

Q. Other than a regular text message on a phone, did you use any apps for instant messaging, What's App or other type of instant messenger?

Page 60

A. Yeah, I think there was a group chat with What's App between a bunch of people that golfed in a golf league.

Q. How about with city personnel?

A. No.

Q. Never anything outside of phone calls or normal text messages?

A. With What's App?

Q. No, I'm saying with city personnel, you communicated either by voice or text message through the regular text messaging?

A. Or there was a feature on our desktop for the instant messenger that we did communicate with that a lot as well.

Q. Okay. So it's an instant messenger desktop. Is that an app? Do you know what that was through, where it came from?

A. No, it was through the city server. It was just a, it was similar, a feature to text message, but it was on the desktop that would pop up and it was used regularly though.

Q. Do you know if the city kept the records of those messages?

A. They would have been on the server. I don't know, you know, again, depending on the time

Page 61

frame, I don't know how long they kept them for.

Q. What time did you leave office as mayor?

A. November of `21.

Q. Were they still using that app at that time?

A. Yes.

Q. Do you know if they're still using it now?

A. I don't know.

Q. In your criminal case, you entered into a plea agreement, is that correct?

A. That is correct.

Q. Can you tell me what you pled to?

A. I pled guilty to wire fraud and I think the other one was bribery.

(Marked Exhibit No. 5.)

Q. (Continuing, by Mr. Austin) Can you take a look at that, and you can page through it if you'd like. I was saving trees and made it two-sided.

A. Okay.

Q. Do you recognize that?

A. It looks like the plea agreement.

Q. Your plea agreement?

A. Correct.

Q. And when did you enter into that?

A. It says August 22nd, `23.

Q. And does this -- you had said you pled guilty to



HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

Richard Sollars, Jr.
12/20/2024

Pages 62..65

Page 62

wire fraud and bribery.  Does looking at this confirm that?

A.  Yes.

Q.  Okay.  And this sets forth the factual basis on page five?

A.  Okay.

Q.  How is that factual basis arrived at?  Did you have any part of that?

A.  What do you mean did I have any part of it?  Could you --

Q.  Well, let's back up a second.  Where you see the factual basis for Count 1 there, and you just read through that I'm assuming, correct?

A.  Correct.

Q.  Is that something that you agreed to?

A.  Yes.

Q.  And does that set out the factual basis for the crimes you were accused of?

A.  Yes.

Q.  And that you pled guilty to?

A.  Yes.

Q.  Is that the sum of the facts or were there other facts around it?

MR. WAGNER:  I'll object to the form of the question as vague.

Page 63

A.  There were other facts around it.

Q.  (Continuing, by Mr. Austin) Can you tell me those other facts?

A.  I can't because it will be part of the appeal.

Q.  And the facts that are involved here, was it because you were taking money for things?

A.  I'll plead the Fifth.

Q.  Did anything in the factual basis for your pleading guilty have to do with Gasper Fiore?

A.  It did not.

Q.  Did anything have to do with the towing contracts?

A.  It did not.

Q.  Did the FBI question you at all about Gasper Fiore?

A.  They did not.

Q.  Did they question you at all about the towing contracts?

A.  They did not.

Q.  Did they question you about any conversations between Gasper Fiore and Shane Anders?

A.  They did not.

Q.  Do you know who Charlie Johnson is?

A.  Yes.

Q.  Who is he?

A.  He's a city council member.

Q.  Currently?

Page 64

A.  Yes.

Q.  And was he when you were mayor?

A.  He was.

Q.  And do you know how long he's been a city council member for the City of Taylor?

A.  I believe this is his third term.

Q.  Which would be how many years?

A.  So there are three four-year terms, so if he completed two four-year terms, I think they're in year three now, so 11 total right now.

Q.  Okay.  Did you ever have any discussions with Charlie Johnson regarding the towing contracts?

A.  Not specifically.

Q.  Vaguely, broadly?

A.  Just during the council meetings.

Q.  Did you ever talk with him about Shane Anders?

A.  No.

Q.  You never talked with Robert Dickerson about having Charlie Johnson make allegations against Shane Anders?

A.  Make allegations against Shane Anders?

Q.  Yes.

A.  No.

Q.  Were you aware of any council members who were putting out on social media that Area Towing was

Page 65

not doing a good job for the City of Taylor?

A.  Not specifically.

Q.  Okay.  Based on that hesitation, why do you say not specifically?  Can you expand on that for me?

A.  Well, there is a city council member that makes a lot of statements.  I just don't know that they're on social media.

Q.  Who is that city council member?

A.  Butch Ramik.

Q.  Okay.  And what were some of those statements?

A.  I don't know.  The guy has made a whole lot of statements about a whole lot of people, including me.

Q.  What were they concerning?  Let's stick to towing.  What did Butch Ramik say about towing?

A.  I don't know.  I only know like there was a Channel 2 interview.  That's the only thing, I remember him being interviewed on Channel 2 and making some statements.  I don't remember specifically what they were, but I do remember him making some kind of statement, but I just don't know if it was on social media, so that was my hesitation, so sorry.

Q.  So we'll take the social out of it and just talk media.  What do you recall of Mr. Ramik's, let's

HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

Page 66

Q. start with, was it Channel 2, Fox 2?

A. I believe it was.

Q. Okay. The Fox 2, did you have a reaction to that when you heard it?

A. I saw it after the fact, so I don't -- I just don't know that it was a believable statement, what he was saying. That was probably my only reaction.

Q. Okay. And as a statement, can you, and I don't mean specifically. You can do it broad and I won't quote you on it, but what was he saying?

A. He was just talking generically or generally about complaints coming in and the level of complaints.

Q. Regarding towing?

A. Yes. And, again, as I mentioned earlier, there are complaints. I just don't know that they were to the frequent level that he was speaking to.

Q. Okay. Was he -- did he say anything about Shane Anders specifically?

A. I don't recall that.

Q. You got complaints. Everybody complains about towing. If you got towed today, how would you feel?

A. Probably not good.

Page 67

Q. Okay. Did you ever get compliments about Area Towing and the job that they did?

A. Yeah, I think, I mean I've seen like e-mails come through. I don't remember if they were -- I think they were the police chief or the police department. They didn't come to me specifically, but I have seen e-mails.

Q. Okay. That said that the job was done well or were complimented?

A. Yes.

Q. Okay. Would you agree that more people complain than compliment just because that's the nature of it? You often will complain when you don't like something, but not often say, boy, that was a job well down?

MR. WAGNER: Objection, form, foundation, lay opinion. Answer if you can.

A. Yeah, I think generally speaking that most people complain about towing in general.

Q. (Continuing, by Mr. Austin) Do you know how Chief Scalbassi felt about Area Towing? Were they doing a competent job?

A. So I don't know. I know that early in my term, maybe even before my term as mayor, Chief Scalbassi had personal issues, and I don't know

Page 68

if it was with Shane Anders or with Area Towing, and that continued for a period of time, but I think in general as it relates to towing, I don't think she had any issues with it.

Q. Did she ever bring any issues to you regarding the towing and the service that was being provided?

A. Other than just people complaining about the invoice amount, that would be generally what I would see.

Q. Okay. But, for example, not as regard to the service that was provided, to the police department to clear the roadway?

A. No, I didn't see anything in terms of that. Again, the only complaints I generally saw would be price-related.

Q. Okay. Did you ever contact any news media to do a story on Area Towing?

A. No.

MR. AUSTIN: Mark that one please.

(Marked Exhibit No. 6.)

Q. (Continuing, by Mr. Austin) Can you take a look at Exhibit 6 and tell me if you recognize that document?

A. Vaguely.

Q. Vaguely can you tell me what it is?

Page 69

A. I believe this is in summary a continuation of the existing contract until a new one is approved.

Q. And that's a towing contract?

A. Towing contract, correct.

Q. Do you know if this was -- we discussed a couple of resolutions that were, or motions in the minutes to the March 20 meeting. We had discussed the one motion that was defeated and then the next one that was approved that said Area and J & M would do it and that's the one that you vetoed. Was this in response to your veto, do you know?

A. I don't remember the timing of it, but I suspect this was approved after the veto.

Q. And this is extending Area Towing's contract. Do you recall what terms those were?

A. I don't. I think it was just until a new contract was approved.

Q. Okay. And was that just month to month?

A. I believe it was, yeah, a continuation of, if that was approved a month from now or a year from now, I believe that's the intent.

Q. Okay. And do you remember what year this was? Are we talking 2019, is that correct?

A. I don't recall.


HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

Richard Sollars, Jr.
12/20/2024
Pages 70..73

Page 70

Q. Let me find those minutes. We're in 2018. So 2018 to 2021 you're still the mayor, correct?

A. Yes.

Q. And there is no date on that, but can I assume that that's in a mid-to-late 2018 time period?

MR. WAGNER: Objection, foundation.

A. I would have no reason to doubt it, but likely.

Q. (Continuing, by Mr. Austin) And I'm reaching that based on the minutes and your veto.

A. Yeah, I mean I would assume that's fairly accurate.

Q. Okay. So based on that, from the time that this extension was granted to the time that you left office as mayor, was anything more done about towing?

A. In terms of --

Q. In terms of a new RFP, a new contract for Area Towing, bringing it in with a no bid?

A. I don't recall specifically if anything was brought back forward to city council. I believe as it related to my position, it had been bid out already, so it was up to city council to decide how they wanted to proceed and when. Rebidding it at that point would be redundant because it was already bid.

Q. Okay. And it seems that there was, and tell me

Page 71

if you would agree with me, kind of a flurry of activity around towing at this 2018 time with the RFP and looking for are we doing one tower, two towers, three towers, heavy duty this. Would you agree there was kind of a flurry of activity in the towing part?

A. I don't know about the -- I think from the administration's position, it was we were looking for an approval to allow the police department to proceed how they deemed fit.

Q. Okay. And with that in mind, was that prior to my so-called flurry or was that after this all went down?

A. No, I think that is the flurry. I think the approval of one or two or three vendors, the intent was to allow the police department to use them how they wanted to use them or at all.

Q. Okay. So the month-to-month is in place. The police are using Area Towing on a regular basis month-to-month. In your view as mayor, is there anything to do or you just keep it month-to-month?

MR. WAGNER: Objection, asked and answered.

A. Yeah, I think the intent was we bid it out. The city council had the tools to make a decision

Page 72

and they brought this forward in lieu of a decision.

Q. (Continuing, by Mr. Austin) And you took no other steps after that toward towing for the rest of your tenure. Is that safe to say?

A. Well, we discussed, like periodically a city council member may come to me and say, hey, what are we doing with towing and the position was we've done it. It's up to city council at this point to proceed how they want to proceed.

Q. Do you remember who those city council members were?

A. I don't.

MR. WAGNER: Off the record for a second.

(Recess 11:20 a.m. to 11:30 a.m.)

(Marked Exhibit No. 7.)

Q. (Continuing, by Mr. Austin) Can you take a look at Exhibit 7, which unfortunately has a lot of like a picture book with really huge pictures and half of your face on one of them?

A. I see Mike Morse law firm.

Q. Yeah, I'm not sure why we're advertising for him here, but --

MR. WAGNER: Can't get away from Mike Morse.

Page 73

MR. AUSTIN: No, we can't get away from Mike Morse.

Q. (Continuing, by Mr. Austin) Tell me when you've read it through.

A. Okay.

Q. And this is a February of 2019 article from the Detroit News. Have you seen it before and have you read this, do you know?

A. It looks familiar. I don't remember specifically if I read this one, but --

Q. Okay. On the first page, not on the Gasper's head page, the first paragraph says, "FBI agents wiretapped towing titan Gasper Fiore's phone three years ago and heard allegations involving Taylor Mayor Rick Sollars and a lucrative towing contract, according to sealed records that hint at the possible roots of a new corruption investigation." Did the paper get it wrong or were there phone calls between you and Gasper Fiore?

A. Yeah, I don't think there were phone calls between me and Gasper Fiore. As a matter of fact, I know there were not, but I also don't know if that's what it says. I thought it says here it was between Gasper and somebody named

Richard Sollars, Jr.
12/20/2024
Pages 74..77

Page 74

Nicholas Primus.

Q. Okay. Do you know Nicholas Primus?

A. I do not.

Q. Never had a conversation with him?

A. Not that I know of.

Q. Okay.

A. Certainly never had lunch with him unless he was with somebody else.

Q. And that's on the page with your smiling face on it where it says, "In May 2016, Fiore spoke during one wiretapped conversation to a man named Nicholas Primus. Primus described a recent lunch with the Taylor mayor, according to the wiretap affidavit." That's what you're referring to?

A. Yeah.

Q. And you say that never occurred?

A. I don't know who Nicholas Primus is, so if he was at a lunch meeting with me, unless he was a guest of somebody else, I've never met the guy.

Q. And so if you've never met him, then you never referenced a municipal contract for towing vehicles?

A. Certainly wouldn't have talked to Nicholas Primus about towing.

Page 75

Q. Did you do -- you said you -- time out. Do you recognize this article you think?

A. I kind of remember. There was so many articles, unfortunately, that some of them do run together, but I seem to remember this because I remember reading that guy's name and I have no idea who it was.

Q. Did you contact The News and ask them why they would put that in there?

A. I did not.

Q. Did you give a contradictory statement to any news source?

A. Not that I'm aware of.

Q. What were some of the articles that were coming out at this time?

A. I don't know. I mean there were always articles about mayors and local leaders and there was many different articles.

Q. Okay. Were you looking at any specific ones when you just mentioned there were a lot of them coming out at that time?

A. No, no.

Q. And because it was you, it didn't make you sit up and take notice?

A. I mean I just didn't pay much attention to it.

Page 76

Q. Okay. On the page with your chin.

A. Okay.

MR. WAGNER: Just to make it more concise, that's five of 17.

MR. AUSTIN: Thanks, Geoff. I was going by the picture, not the printing.

Q. (Continuing, by Mr. Austin) It mentions in the first paragraph FBI Special Agent Robert Beeckman. Do you know anything about Special Agent Robert Beeckman?

A. I do not.

Q. Okay. And he's quoted in the middle saying, "'Apparently, the mayor,'" and that would be you, "'is leaving it up to (a businessman) and Fiore to work out who is the municipal tower for Taylor,' Beeckman wrote in a wiretap affidavit." Did you ever see that affidavit?

A. I did not.

Q. And, again, you don't know Beeckman?

A. Never heard of that name before.

Q. And you're denying that again in a recap that you didn't have phone conversations with Gasper Fiore, correct?

A. That is correct.

Q. And none with Nicholas Primus?

Page 77

A. Don't know who that is.

Q. Never had a lunch conversation talking about municipal contracts for towing?

A. I did not.

Q. Did you ever have any discussions with Shane Anders regarding the towing contracts or towing for the City of Taylor either during the RFP process or prior to it or after it?

A. I don't remember, but it's possible.

Q. Do you ever remember a conversation with Shane Anders where he let you know that he would be uncomfortable working with Gasper Fiore?

A. I don't recall that.

Q. Would you say it didn't happen?

A. I wouldn't say it didn't happen. I just don't recall it.

Q. So you may have had that conversation?

A. It's possible.

Q. Okay.

(Marked Exhibit No. 8.)

Q. (Continuing, by Mr. Austin) Exhibit 8 is a subpoena that we sent to Herman Ramik, who you referred to as Butch I think?

A. Yes, I apologize. I think his name is Herman.

Q. I think you said Harold, but that's okay. We'll

Richard Sollars, Jr.
12/20/2024
Pages 78..81

Page 78

call him Ramik.

A. Okay.

Q. And on the last page of this subpoena are the documents that we requested of Mr. Ramik.

A. On the last page you said?

Q. Yes.

A. Okay.

Q. So we were looking for all text messages regarding Shane Anders, Area Towing, Star Towing, Gasper Fiore, Boulevard & Trumbull or the City of Taylor contract, texts or personal messages pertaining to the same or copies of text messages in his possession from any source that were obtained by the FBI as a result of discovery or electronic surveillance in your criminal case, and he provided us with some documents in response to this. Can you think of any reason why he would have in his possession any text messages or documents that were obtained by the FBI?

MR. WAGNER: Before you answer that, have you produced a copy of the response to the subpoena to us?

MR. AUSTIN: I don't believe we have.

MR. WAGNER: Is there a reason why not?

Page 79

It's not important, but will you please provide us a copy of whatever you received?

MR. AUSTIN: Yes, yes.

Q. (Continuing, by Mr. Austin) Now you can answer.

A. Okay. I can't think of a single reason that he would have obtained anything from my text message legally.

Q. Or do you know any reason why he would have anything from the FBI file?

MR. WAGNER: Objection, foundation, calls for speculation.

Q. (Continuing, by Mr. Austin) You can speculate.

MR. WAGNER: If you can.

A. I don't have any knowledge or understanding or I would be very upset to find out he had anything involving me.

Q. (Continuing, by Mr. Austin) Would you be surprised if there were text messages regarding Area Towing and you?

A. No, I mean I don't know why there would be.

Q. Okay. Would it surprise you if there were text messages between you and Robert Dickerson encouraging Charlie Johnson to make negative comments about Area Towing?

A. Would it surprise me?

Page 80

Q. Yes.

A. Yes, it would surprise me.

Q. Why?

A. Because I would never suggest Charlie Johnson make a negative comment about anybody.

Q. Anything based on any of the questions toward the end that would make you want to change any of the testimony that you've given previous?

A. I don't think so.

Q. Okay.

MR. AUSTIN: Geoff, would you have any objection to contacting the case administrator to talk about the Fifth Amendment?

MR. WAGNER: I would. If you have an issue with it, I think you should state it succinctly in a written motion and allow sufficient briefing so that Mr. Sollars' criminal lawyers can participate because they are the source of the Fifth Amendment objection that was placed on the record today.

MR. AUSTIN: And for the record, we'll continue the deposition until that's resolved, I mean we're not going to sit here, but until we get that --

MR. WAGNER: You can state your

Page 81

position in a motion with the judge and raise the, you know, request the ability to come back and ask additional questions, yes, I think that would be a much better use of everyone's time.

MR. AUSTIN: Okay.

MR. DAVIS: Do you want to take five and make sure we're done? Let's take a quick five.

MR. WAGNER: All right.

(Recess 11:44 a.m. to 11:48 a.m.)

Q. (Continuing, by Mr. Austin) I just have two more questions and then Geoff can pummel you with all the questions that he has because I know he's just been dying to get in here, and I may have asked this already, but I just want to make sure. Did the lack of political contributions from Shane Anders lead you to veto the resolutions that were given in the long-term contract.

A. No, I had nothing to do -- I honestly don't even know if there was a lack of contributions, but it would not have impacted it.

Q. Okay. And were you aware that Shane Anders was interviewed by the FBI?

A. I was not.

Q. Okay. Nothing else.

HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

Richard Sollars, Jr.
12/20/2024
Pages 82..85

Page 82

A. Just -- I'm sorry.

Q. Go.

A. I'm now aware of it only because I saw the news interview that was on Channel 4, but I was not aware of anything until that media thing came out.

Q. Which interview are you talking about?

A. I don't know. Something on Channel 4.

Q. Recently?

A. No, no, it was, well, a few years back.

Q. Okay. Do you know what the content of that one was?

A. I think it was over the towing and the FBI. It was just kind of, it was centered around that.

Q. Okay. Did you draw any conclusions from that?

A. No, I don't really know anything about it other than what was -- I think I watched 30 seconds of it.

MR. AUSTIN: Okay. Nothing else.

EXAMINATION

BY MR. WAGNER:

Q. I have one or two quick follow-ups for you, Rick. If you could turn your attention to the document that Jim had marked as Exhibit No. 2. It is your veto dated March 23, 2018. Do you have that document in front of you, sir?

Page 83

A. Yes.

Q. Do you recall being asked questions about this document?

A. Yes.

Q. One of the questions that was asked related to the city's policy of having a contract be three years or possibly longer in the event that it provided what you called an economic benefit to the city. Is that an accurate summary of your testimony?

A. That is.

Q. Could you tell us or explain to us how the city could benefit economically from a given contract being opened up from an exclusive vendor to multiple vendors?

A. So I think when I took office in 2013, one of the goals we had was to try to promote as many multiple vendor contracts as we could instead of exclusivity. We did it with engineering. We did it with emergency board-ups. We did it with grass cutting. There is probably multiple others that we did incorporate multiple vendors, but it encourages competition, and as a result, it forced everybody to be better and always keep honest pricing, and so that was always our goal

Page 84

from day one from the day I took office.

MR. WAGNER: I have no further questions at this time.

RE-EXAMINATION

BY MR. AUSTIN:

Q. Just a follow-up on that. You're talking multiple vendors and yet if we go back to the Rizzo contract, there wasn't even a chance for multiple vendors. Why?

A. So the Rizzo contract was unique because the city had to get somebody to acquire the liability, the assets. Some would call it an asset. It was really more of a liability being the garbage trucks. As I mentioned earlier in the deposition, the City of Taylor with Paul Ruthenberg had made a decision to buy the trucks and allow Paul's company to operate them, which is unheard of to me, so when Paul was in the process of closing his doors, we had to find somebody willing to buy that from the City of Taylor, which at that point in time they were probably five years old and under severe neglect, so you weren't buying an asset, you were buying a liability and, as a result, there just weren't a lot of people willing to take

Page 85

that risk.

MR. AUSTIN: Okay. One final. Geoff, what's the exhibit that's the resolution that went month to month?

A. This one?

Q. (Continuing, by Mr. Austin) Yes, yes. That basically left in Exhibit 6 the resolution that kept Area Towing on extended month-to-month, that basically left an open contract out there. Is there any reason that you didn't veto that?

A. No. Again, other than just from my position as the administration we did everything we could do. We bid it out. We brought forward a recommendation for three vendors and, as a result, city council did what they did. I didn't see the need to veto it because from our position, we had hoped that city council would bring forward one of the proposals that we had presented to them, but, unfortunately, that did not happen.

MR. AUSTIN: Okay. Nothing else.

MR. WAGNER: We are done for now.

(Deposition concluded at 11:54 a.m.)

STATE OF MICHIGAN)

           )

COUNTY OF MACOMB )

    I, Ann L. Bacon, a Notary Public in and for the above county and state, do hereby certify that the witness, whose attached deposition was taken before me in the entitled cause on the date, time and place hereinbefore set forth, was first duly sworn to testify to the truth, and nothing but the truth; that the testimony contained in said deposition was reduced to writing in the presence of said witness by means of stenography; that said testimony was thereafter reduced to written form by mechanical means; and that the deposition is, to the best of my knowledge and belief, a true and correct transcript of my stenographic notes so taken.

    I further certify that the signature to and the reading of the deposition by the witness was waived by counsel for the respective parties hereto; also, that I am not of counsel to either party or interested in the event of this case.

_____

Ann L. Bacon, Notary Public, Macomb County
Acting in Oakland County
My commission expires:  6/29/29