# EXHIBIT S

FD-302 (Rev. 5-8-10)

OFFICIAL RECORD
Document participants have digitally signed.
All signatures have been verified by a
certified FBI information system.

## FEDERAL BUREAU OF INVESTIGATION

Date of entry    03/19/2018

### DOCUMENT RESTRICTED TO CASE PARTICIPANTS

This document contains information that is restricted to case participants.

### TITLE III COMMUNICATIONS

This document contains information obtained under the Federal Wiretap Act and may not be disseminated except when disclosure is expressly permitted, i.e., when: (1) disclosure is from one investigative or law enforcement officer (ILEO) to another ILEO and such disclosure is for the proper performance of the official law enforcement duties of either officer; (2) disclosure occurs while testifying under oath in a proceeding held under the authority of the U.S. or of any state or political subdivision thereof; (3) disclosure is to another federal law enforcement, intelligence, or national security official and the information pertains to foreign intelligence, counterintelligence, or foreign intelligence information that will be used to assist the receiving official in the performance of his or her official law enforcement or intelligence-related duties; or (4) disclosure is to an appropriate U.S. or foreign government official and will be used only to respond to a threat of actual or potential attack or other grave hostile act of a foreign power or agent thereof, domestic or international sabotage, domestic or international terrorism, or clandestine intelligence gathering activities by an intelligence service or network of a foreign power or agent thereof, within the U.S. or elsewhere.



███████████, previously identified, was interviewed in the presence of his attorney, ███████████, as well as Assistant United States████████████████████████. ████ was interviewed pursuant to a continuing proffer agreement. He provided the following information:

████████████ ████████ is good friends with ██████████. ████ was a driver for ████████. He is now a ███████████████. ████ believes that ████ is still ████' driver.

████ provided information about an intercepted call between himself and ████ in April of 2016. ████ met with ████ at ████████ restaurant. ████ was bidding on a truck-towing contract with the ████

Investigation on  01/04/2018  at  Detroit, Michigan, United States (In Person)

File #  194C-DE-2179366, 194B-DE-4264096-████     Date drafted  02/12/2018

by  BEECKMAN ROBERT F, MICHAEL JOSEPH K

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 05-08-10)

194C-DE-2179366

Continuation of FD-302 of (U) ███████████ Continuing Proffer ,On 01/04/2018 , Page 2 of 7



████████████████ ███ gave ████ some paperwork to give to the director of procurement or someone in a similar capacity. ████ wanted the official to understand that it was not a low-bid project.

████ bought property on ██████████████ He wanted the brownfield money that was associated with this property. He does not think that ████ had anything to do with this property.

████ has never paid ██████████

████████████████████████ has been a good friend to ████. ████ has supported ██████████ within campaign finance limits. ████ did not show up to the last three or four campaign events. ██████ has charitable funds for Christmas, which ████ also supported.

████ did not get favored treatment from ████████████ does not know anyone else who got favored treatment from ██████ Once or twice, ██████████ may have called for a personal favor.

Three to four months ago, ██████ went to see ████████ and he told him what was going on with ████'s legal troubles. ████████ pulled ████'s contract. ██████ told ██████ about how ████████ was still getting cars from the ████

███████████████████

██████████████████ used to call ████ for fundraising. Once or twice, ██████ gave her cash. This occurred at the ████████████████ ██████████ She was on the ██████████████████ at the time. She would call and ask for support. ██████ met her at the restaurant and gave her three to four hundred dollars at a time. At a later time, he probably wrote her a check. He did all of these things for ██████ because he wanted her support.

███████████████████████

██████ is aware that ████████████ was trying to buy out ████ ████████, the incumbent ████████ in the cities of ████████ to have ██████████ declare bankruptcy, and then secretly pay him as a consultant, but ████ did not know anything about it.

██████ has met ████████████████████████ a couple of times. ██████ is the father of the ██████████████████, owned a ████

FD-302a (Rev. 05-08-10)

194C-DE-2179366

Continuation of FD-302 of (U) ▮▮▮▮▮ Continuing Proffer ,On 01/04/2018 , Page 3 of 7

▮▮▮ which he sold to ▮▮▮▮, ▮▮▮ probably supported ▮▮▮▮▮▮ at a breakfast fundraiser.

▮▮▮ knows ▮▮▮▮▮ Mayor of ▮▮▮ He knows ▮▮▮▮▮ on the ▮▮▮▮▮▮▮ ▮▮ does ▮▮▮▮▮▮ for the City of ▮▮▮ He would have to ask ▮▮▮▮▮ to be able to give details about the work.

▮▮▮▮ has never given ▮▮▮▮▮ or ▮▮▮▮ anything which ▮▮▮▮ would describe as "this for that." He has no business partnership with ▮▮▮▮.

▮▮▮▮▮ has asked ▮▮▮ for things. He was the ▮▮▮▮▮ in ▮▮▮▮ at a time when ▮▮▮ was interested in working in ▮▮▮▮ ▮▮▮ promised ▮▮▮ the ▮▮▮ work, and said something like "get us (a specified amount) of support." ▮▮▮ did not remember the exact amount of money that ▮▮▮▮ wanted. ▮▮▮ had a function for ▮▮▮▮ ▮▮▮▮▮▮▮ wanted. ▮▮▮▮▮ collected the money. It was in money orders and there could have been some cash also. ▮▮▮ recalled that it was between $10,000 and $20,000.

A couple of months or more went by after the fundraiser. ▮▮▮▮ awarded the work to three other tow companies: ▮▮▮▮▮▮▮ ▮▮▮ ▮▮▮▮▮ "kind of blew off" ▮▮▮. ▮▮▮▮ may have called him an idiot after this.

▮▮▮▮▮ is now the ▮▮▮▮▮▮▮ He has called ▮▮▮'s company for support. He has not asked ▮▮▮ for help in a year or so.

There were a couple of times that ▮▮▮ gave ▮▮▮▮ a few hundred dollars. It was at a golf outing or something. ▮▮▮ does not know if ▮▮▮▮ reported it.

▮▮▮▮▮

▮▮▮ gave ▮▮▮▮▮▮▮▮▮ cash. He gave her a couple hundred dollars, what he calls "lunch money," on three or four occasions. In the last year, he gave her money because her dog got sick. He may have given her $500 because her child was going back to college.

About a year ago, ▮▮▮▮▮▮▮▮▮▮ was being sentenced by ▮▮▮. Someone else asked ▮▮▮ to talk to ▮▮▮ and find out how hard she was going to go on ▮▮▮▮. ▮▮▮ did this, and ▮▮▮ refused to say. She said "I'm not going to go there."

▮▮▮▮▮

FD-302a (Rev. 05-08-10)

194C-DE-2179366

Continuation of FD-302 of (U) ▮▮▮▮▮ Continuing Proffer , On 01/04/2018 , Page 4 of 7

The only car that ▮▮▮▮ gave ▮▮▮▮▮▮▮ was a Ford Fusion which she picked up at Metrotech.

▮▮▮▮▮▮ met ▮▮▮▮▮▮▮▮▮▮▮ through ▮▮▮▮▮ first said that he gave ▮▮▮▮ cash on at least two occasions, possibly three. Later in the interview, he recalled that it was three times. The cash was between $500 and $700 each time. There were a couple of times when ▮▮▮▮ had fundraising parties and ▮▮▮▮ paid for the drinks. ▮▮▮▮ has also bought dinner for ▮▮▮▮▮▮.

In 2000, ▮▮▮▮ company, ▮▮▮ had a contract with the ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮ to do courtesy patrol on the freeways. The company is now in the name of ▮▮▮▮▮▮▮▮▮s daughter. Before ▮▮▮▮▮ took this over, ▮▮▮▮▮▮▮▮ handled the administrative duties of the company.

▮▮▮▮▮▮ was asked about an intercepted call in which he discussed getting ▮▮▮ to do something to get a competitor named ▮▮▮▮▮▮ thrown out. ▮▮▮▮ said he did not get involved with this contract until the end. When he was intercepted, he was trying to get ▮▮▮▮▮▮ thrown out. They did not have any trucks. They were a startup company. ▮▮▮▮, or possibly ▮▮▮▮▮▮▮▮ came up with the idea to do an amendment requiring three years' experience to prequalify for this contract.

▮▮▮▮▮▮ does not know how ▮▮▮ got the contract pulled in 2015. ▮▮▮▮▮▮ would know. ▮▮▮ does not know if ▮▮▮▮▮▮▮ was the low bid. He was not involved in the details.

▮▮▮▮ is aware that the purpose of the prequalification amendment was to kick out the bid of ▮▮▮▮▮▮▮ ▮▮▮ was trying to push the amendment through to benefit the ▮▮▮▮ This is what is being discussed in an intercepted call in which ▮▮▮ asked ▮▮▮ if ▮▮▮▮▮ would drop the amendments if ▮▮▮ just gave the contract to the ▮▮▮▮▮

▮▮▮▮▮ met with ▮▮▮▮ to give him paperwork. He gave ▮▮▮▮ a folder with tow bills, invoices, and information about a towing competitor called ▮▮▮▮▮▮▮▮

There were a couple of times when ▮▮▮▮ gave ▮▮▮ $300 to $400 in cash for his campaign in April of 2016.

▮▮▮▮ paid ▮▮▮ because ▮▮▮▮ was helping him and ▮▮▮▮ appreciated it. ▮▮▮▮ gave ▮▮▮ between $500 and $700 on three occasions

FD-302a (Rev. 05-08-10)

194C-DE-2179366

Continuation of FD-302 of (U) ▮▮▮▮▮▮▮▮ Continuing Proffer ,On 01/04/2018 ,Page 5 of 7

within a one-year period, with some of the money being paid in 2015 and some in early 2016. One of the occasions took place three blocks to the east of Mack and Alter Road.

Whenever ▮▮ met with ▮▮, it was concerning issues with the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Sometimes when ▮▮ gave ▮▮ paperwork, he slid cash over to him.

On one occasion, ▮▮ had his family over to visit. ▮▮ offered him a billboard on this occasion. This was intercepted in a telephone call. Later in the night on this occasion, ▮▮ gave ▮▮ cash. ▮▮ gave ▮▮ money because he was helping with ▮▮ ▮▮ took the money and did not ask questions.

▮▮ did not help ▮▮ He went to a ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. ▮▮ wanted help, and he knew that ▮▮ would help him. He gave ▮▮ money because he wanted ▮▮ to be motivated. ▮▮ was not asking for the money, but he took it.

▮▮▮▮▮ would not change her mind about helping ▮▮▮▮. ▮▮▮▮ (now retired) was the ▮▮▮▮▮ who changed the towing rules. ▮▮▮▮▮▮ got transferred from her position, because she was going to let ▮▮ do the work.

Three to four years ago, ▮▮ came up with a rule that each owner could have only one company. ▮▮ owned ▮▮▮▮▮▮▮▮ and ▮▮▮▮▮▮▮▮ dropped ▮▮'s companies.

▮▮ wanted bills showing price gouging by his competitors, including ▮▮▮▮▮▮ and ▮▮▮▮. He collected these bills and gave the paperwork to ▮▮ ▮▮ talked to ▮▮▮▮▮ at ▮▮ and to the ▮▮▮▮▮'s office. ▮▮ began asking for this help from ▮▮ as early as 2015.

▮▮ showed up at ▮▮' fundraisers. He paid for drinks at the fundraisers at Sindbad's and Diaguardo's on Mack. He did this twice, and the bar bill was about $800 on each occasion, he believes. It is possible that he just attended the first fundraiser, but he definitely paid for the bar bill on the second fundraiser. This was during a period of time when television news reporter ▮▮▮▮▮ was following ▮▮ around.

▮▮ was asked about an intercepted call in which ▮▮ was talking to ▮▮ and ▮▮ spoke to ▮▮▮▮▮, who was in the room with ▮▮. ▮▮ lied to ▮▮ and said that he was on the phone

FD-302a (Rev. 05-08-10)

194C-DE-2179366

Continuation of FD-302 of (U) ▮▮▮▮▮ Continuing Proffer ▮▮▮▮▮ , On 01/04/2018 , Page 6 of 7



with his mother, when it was in fact, ▮▮▮▮ He lied because ▮▮▮▮ would not help if he knew that it was really ▮▮▮ on the telephone and asking for help.

▮▮▮▮ fixed ▮▮▮▮ brother's car, which needed a new transmission or motor. This was about two years ago. ▮▮▮▮ may have fixed the car at his scrap yard, or in a garage. ▮▮▮ met the brother once or twice.

▮▮▮▮ was asked about intercepted call GF9114 from May 30, 2016. When he discussed "paperwork" that he wanted to show ▮▮▮ he was talking about towing invoices that he wanted ▮▮▮ to take to ▮▮▮▮ ▮▮▮ thought that ▮▮▮ was making contact with people at ▮▮▮ on his behalf regarding towing.

▮▮▮▮ is certain that he gave ▮▮▮ cash at ▮▮▮▮ s. ▮▮▮ family was there on this occasion. He sat with ▮▮▮ for awhile, and handed the cash to ▮▮▮ on the way to the restroom or something.

There may have been one more time that ▮▮▮ wrote a check to a ▮▮▮ fundraiser. ▮▮▮ said that he usually paid for drinks or something.

▮▮▮▮ does not know if ▮▮▮▮▮ actually wrote the prequalification amendment.

▮▮▮▮ talked to ▮▮▮▮ a couple of times regarding ▮▮ ▮▮▮ had parties for ▮▮▮▮ ▮▮▮ later sent one of ▮▮▮ s donation checks back. ▮▮▮ has only spoken to ▮▮▮ regarding ▮

▮▮▮▮▮ told ▮▮▮ that he sat on the panel that considered the courtesy patrol contract and it was a joke. ▮▮▮ said that ▮▮▮▮ was not qualified. ▮▮▮ denied giving money or car repairs to ▮▮▮

▮▮▮▮ was asked about intercepted calls between himself and ▮▮▮ ▮▮▮ and ▮▮▮ in which ▮▮▮ and ▮▮▮▮ referred to ▮▮▮ s "political might." ▮▮▮ said this was "just talking." ▮▮▮ was the might behind ▮▮▮

▮▮▮▮ denied knowing anything about purposely taking a van off the road, or cutting off access to the GPS systems on the vans.

▮▮▮▮ was asked about GF5225 from May 5, 2016. ▮▮▮ said that he probably missed ▮▮▮ on this occasion. He does not know what ▮▮▮ is talking about in this call.

FD-302a (Rev. 05-08-10)

194C-DE-2179366

Continuation of FD-302 of (U) ████████████ Continuing Proffer _____ , On  01/04/2018  , Page  7 of 7

      ████████ brought $2,000 in cash to ████████ as a donation to ████ ████████s fundraiser. ████ gives free billboards to ████ and says "you owe me." ████ was having the fundraiser. ████████ would not know ██████ The $2,000 was ████s contribution. ████ does not know what ████ did with it.

FD-302 (Rev. 5-8-10)

**OFFICIAL RECORD**
Document participants have digitally signed.
All signatures have been verified by a
certified FBI information system.

## FEDERAL BUREAU OF INVESTIGATION

Date of entry   05/21/2018

### DOCUMENT RESTRICTED TO CASE PARTICIPANTS

This document contains information that is restricted to case participants.

███████, ████████████████████████████████, telephone number ████████████, was advised of the identity of the interviewing agent. He provided the following information:

In 2013, ███████████ bought a tow company called ██████████ from ██ ████. He was suspended for overcharging, and he was sued by ████████ was deposed in the lawsuit, and he lied about the Sheriff Department, claiming that members of the department called him a "crook." The lawsuit was thrown out.

████████ came to the Sheriff Department and said that he wanted to get in their good graces. He promised to build a building. He offered hockey tickets to ████ ███ refused the tickets and said that he did not accept gratuities.

The smaller townships started a towing board. ███████████ was pushing an expensive software program which the board would have required other towers to use. Some of these tow companies do not tow cars more than five or six times a month. ████████ was giving out Detroit Red Wings tickets to officials to push the software. ████████ owns the software.

The software company is called ████ and it is from California. It would add $40 to the cost of every tow.

Recently, a news story came out about corruption and wiretaps in Detroit. ██████ was mentioned in the article. On the day after the article came out, the towing commission was dissolved and █████████ software deal was canceled. ████████ said that his attorney advised him to meet with police officials, and he made claims of being "on the up and up."

████████ wrote the Michigan State Police tow policy fee schedule. It raised the fee by $50 to $70 per car.

Investigation on   03/05/2018   at   Detroit, Michigan, United States (Phone)

File #   194C-DE-2179366-TAYLOR                     Date drafted   05/14/2018

by   BEECKMAN ROBERT F

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 05-08-10)

194C-DE-2179366-TAYLOR

Continuation of FD-302 of  (U) ███████████████ , On  03/05/2018 , Page  2 of 2

FD-302 (Rev. 5-8-10)



OFFICIAL RECORD
Document participants have digitally signed.
All signatures have been verified by a
certified FBI information system.

**FEDERAL BUREAU OF INVESTIGATION**

Date of entry    08/22/2019

██████████, date of birth (DOB) ████████, residence address ██████████, cellular telephone number ████ ██████████ was interviewed at ██████████████████. After being advised of the identities of the interviewing agents and the nature of the interview, ████████ provided the following information:

████████ has known ██████████ for many years. In April 2016, ████ told ████ that ████ had reached an agreement with ██████ of ████████ to handle all the heavy towing for the City of ████ Michigan ████. A couple weeks later, ██████████████████ conducted a traffic stop on a truck belonging to ████████s daughter, ██████████████████. ████'s company is ███. At the time of the traffic stop, the truck was attached to a trailer owned by ████████'s company, ██████████████ ████████ said that the truck was overweight, among other violations.

Once ████████ realized the truck was owned by ██████████'s daughter, he impounded the truck and asked ██████ to tow the vehicle. ██████████ explained that he did this because he knew that ██████████ would not pay the fines on the truck. ██████ contacted ██████████, which towed the vehicle to Monroe, Michigan (Monroe). ██████ has a policy that vehicles which are impounded by the ████ Police Department must be taken to a lot within ████ ████ violated this policy when he directed ██████████ to tow ████'s truck to Monroe.

██████████ charged ██████ nearly $2,000 for the tow, which was more than three times the rate listed at ██████████ place of business. ██████████ and ██████ decided to go to the ████ City Council meeting to protest ████ actions. Outside the meeting, ████ Mayor ██████████ approached ████. ████████ told then-██████████████████, who was

---

Investigation on  08/09/2019  at  Dearborn, Michigan, United States (In Person)

File #  194C-DE-2179366-TAYLOR, 194B-DE-4264096-████████                    Date drafted  08/09/2019

by  Philip D. Reed, HOLLANDER BLAKE ALAN

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 5-8-10)

194C-DE-2179366-TAYLOR

Continuation of FD-302 of ███████████████████████████████ , On  08/09/2019  , Page   2 of 2



with him, to take care of the ████████ 's issue with ██████  ██████  said that the ██████ City Council meeting was not the proper forum for ████████ to resolve his issue.

In the end, ██████ refunded over $1,000 to ██████. ██████ is still owed $125 that ██████ refuses to pay.

After the incident, ████████ called ████ to inform him that ████ ██████ was apparently handling the heavy towing for ██████ Furious, ██████ called ██████ and lambasted him for giving heavy towing work to ████████ when they had agreed otherwise.

████████ left employment with ██████ shortly after the incident.

In approximately 2014, ████████ purchased a T-2000 Kenworth truck from ██████ It had been seized from a drug stop and impounded by ██████ ██████ paid $6,000 for the truck. The ████████████ at the time gave the money ██████████ paid to ██████ ████████ did not understand why ██████ was given the money.

FD-302 (Rev. 5-8-10)

**OFFICIAL RECORD**
Document participants have digitally signed.
All signatures have been verified by a
certified FBI information system.

## FEDERAL BUREAU OF INVESTIGATION

Date of entry    04/18/2019

███████████████████████████████, phone number ████████████, former ████████
███ MICHIGAN, was interviewed in her office at the ███████████████
███████████████████, where she currently serves as the ████████████
███████████████████ After being advised of the identity of the
interviewing Agent and the nature of the interview, ████████ provided the
following information:

████████ served in the ████████████████████████████████ for 23 and
a half years. She retired in ███████████ after serving as the ████████
████ since ████ After retiring, she became a ████████████ in the
████████████ of the ██████████████████████. Near the
beginning of ████████████ she became the ████████████████ and
█████████████.

████████ told agents that she told most people that she retired from
the ████████ to seek a new opportunity with the ████████████ s
office, but in reality she left because she was very uncomfortable with
the way that the current administration was running ████████.

████████ stated that she was hesitant to discuss issues surrounding
████ because it was a "snake pit" and the people running it were
"vicious." She stated that she did not want to testify or have to appear
in court because she feared that ████████████████████████, the ██████
████ to the ████████████, would ruin her opportunity to work at
███.

When ████████████████ became mayor, he was very interested in
towing issues ████████. Towing generated a lot of complaints, and ████████
supported more competition for tows so that it did not become a campaign
issue in his reelection.

Prior to ████████ election, ████████████ negotiated with ████████████
████████ of ████████████ to establish towing rates in ████████ lowering the
costs paid by the citizens.

████████ subcontracted heavy tows or Hazmat. As long as things appeared
to be running smoothly, ████████████ had minimal involvement in day-to-day

Investigation on  09/20/2018  at  Beverly Hills, Michigan, United States (In Person)

File #  194C-DE-2179366-TAYLOR                                    Date drafted  09/25/2018

by  HOLLANDER BLAKE ALAN, Kevin J. Swanson

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 05-08-10)

194C-DE-2179366-TAYLOR

Continuation of FD-302 of (U) Interview of ███████████████ , On 09/20/2018 , Page 2 of 6

towing issues. █████ occasionally used ███████████████████ tow company for heavy tows.

In 2016, ██████ discussed ███ with ███████. ████████ got the impression from ███████ that ███████ wanted to use █████ for heavy tows. At this time, █████s involvement in bribery schemes in Detroit was known publicly. ████████ "vividly" recalls attempting to talk ██████ out of using █████, stating something along the lines of "you know who this guy is." ████████ replied by telling ████████ that after his divorce and federal investigations into bribery, ███████ was a "changed man."

███████████ stated that she couldn't believe she was having these conversations given what was in the news about █████ at the time. These conversations took place before April 2016. ████████ told ██████ we can't use him (referring to █████).

███████████████████████████████ was hired by ████████ to be his ███████ ████████ in April 2016. ████████ and ████████ had been friendly when ██████ was on the ███████████████████████ and when he was ██████ before ████████ came aboard. They were about the same age and had kids. ████████████ believed that things changed when ████████ hired ██████████ – ████████ was still okay when he was alone, but when ██████████ was in the room, he ran the show.

At some point, ████████ became aware of who was doing the heavy tows in ████████████ would call ████████ directly and have conversations about heavy duty towing and ████. ████████████ was never directly told by ████████ to use █████ for heavy tows. Based on these conversations ████████████ told ██████ that she believed ███████ wanted him to use █████ for heavy tows. ████████ and ████████ had conversations without ████████ present about not using █████.

████████ told ████████ that he believed that his contract wouldn't be renewed if he didn't use ██████ for his heavy tows.

At one point, ████████ said that █████ could do cement work and █████ could have the towing and make everyone happy.

████████████ was asked what she believed ████████ meant by "keep everyone happy." ████████ stated that she had no first hand knowledge, but believed it was related to campaign contributions. ████████████ had been told by a colleague that █████ made pretty sizeable campaign donations to ████████.

It appeared to ████████ that some vendors were in charge in ████████

FD-302a (Rev. 05-08-10)

194C-DE-2179366-TAYLOR

Continuation of FD-302 of ___(U) Interview of ▮▮▮▮▮▮▮▮▮▮▮▮___, On __09/20/2018__, Page __3 of 6__



▮▮▮▮▮▮ family business, ▮▮▮▮▮▮ is located in ▮▮▮▮▮▮ ▮▮▮▮▮▮ and ▮▮▮▮ became friendly while they both worked in ▮▮▮▮▮ ▮▮▮▮ believed that ▮▮▮▮▮▮ was advising SOLLARS behind the scenes before he was officially hired. ▮▮▮▮▮▮ heard from ▮▮▮▮▮▮▮▮ and ▮▮▮▮ that ▮▮▮▮▮▮ had a reputation for being a good fundraiser. In 2016, ▮▮▮▮▮ was accused of stealing $25,000 from ▮▮▮▮▮ and used that money to purchase sports memorabilia. ▮▮▮▮▮▮ was sued and bought out from ▮▮▮▮▮▮ in 2016.

At about the time ▮▮▮▮ came in to do cement, there was a sudden change in ▮▮▮▮▮ trash service to a company owned by ▮▮▮▮▮▮▮▮▮▮▮. ▮▮▮▮▮ said that ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ and former ▮▮▮▮▮▮ would have more information on that. ▮▮▮▮▮ also stated that ▮▮▮▮▮▮▮▮▮▮▮▮ told her that she knew that ▮▮▮▮ and ▮▮▮▮▮ had lunch together, contrary to ▮▮▮▮▮▮ public statements.

▮▮▮▮▮▮▮▮▮▮▮▮ the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ is unhappy. ▮▮▮▮▮▮ stated that both ▮▮▮▮ and ▮▮▮▮▮▮▮▮ have taken copies of files home to protect themselves. ▮▮▮▮▮ told ▮▮▮▮ directly that ▮▮▮▮▮ and ▮▮▮▮▮▮ have been in shouting matches.

▮▮▮▮▮ would have good historical information. ▮▮▮▮▮ told ▮▮▮▮▮ that ▮▮▮▮ told him that ▮▮▮▮▮▮ was having towers pay $10,000 just to be considered for towing contracts. It was not clear whether the $10,000 was in the form of donations or other payments.

▮▮▮▮ told ▮▮▮▮▮ that ▮▮▮▮ had made campaign contributions to ▮▮▮▮▮▮▮.

▮▮▮▮▮▮ stated that the following City Council members could provide relevant information: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

▮▮▮▮▮▮▮ is the person listed on court documents that sued ▮▮▮▮▮ at ▮▮▮▮▮▮.

▮▮▮▮▮▮ is the ▮▮▮▮▮▮ and would have relevant information. ▮▮▮▮▮▮▮ was ▮▮▮▮▮▮▮▮ for ▮▮▮▮▮ and his predecessor as ▮▮▮▮▮▮▮▮▮.

▮▮▮▮▮▮ befriended two corporals in the ▮▮▮▮▮▮ One of them was ▮▮▮▮▮▮▮▮▮▮▮ would pass on information to ▮▮▮▮▮▮ that was told to him by ▮▮▮▮▮ In late 2016, ▮▮▮▮▮ asked ▮▮▮▮▮▮ what she wanted him to do if he saw a ▮▮▮▮▮▮▮ committing a violation.

FD-302a (Rev. 05-08-10)

194C-DE-2179366-TAYLOR

Continuation of FD-302 of (U) Interview of ▮▮▮▮▮▮▮▮ , On 09/20/2018 , Page 4 of 6



▮▮▮▮ told him to do his job. ▮▮▮▮▮ interpreted this statement as trying to cover himself because he had been told by ▮▮▮▮ not to write tickets to ▮▮▮▮▮▮▮▮▮▮. ▮▮▮▮▮ offered the use of a condo owned by ▮▮▮ to ▮▮▮▮▮▮▮ would talk to the FBI.

▮▮▮▮▮ was also friends with ▮▮▮▮▮▮▮▮▮▮. ▮▮▮▮ was ▮▮▮▮'s mole in the ▮▮▮▮▮ It was highly unusual for a ▮▮▮▮▮▮▮ to contact individual officers in the ▮▮▮ ▮▮▮▮▮ viewed this as a violation of the chain of command.

▮▮▮▮▮ and ▮▮▮ went to parties together in ▮▮▮▮.

▮▮▮▮ was assigned to the ▮▮▮▮▮▮▮▮ and also worked the ▮▮▮▮▮ which allowed officers to work voluntary overtime working traffic violations. These were desirable positions.

In Fall of 2016, ▮▮▮▮ was caught falsifying his overtime. ▮▮▮ worked his regular ▮▮▮▮▮▮▮ shift, during which he would write all the tickets he needed to write for both his regular shift and ▮▮▮ ▮▮▮ overtime shifts. He would then put in for the overtime, but not work the hours. One of the purposes of the ▮▮▮ was to have officers on the road and available to assist other officers.

▮▮▮▮ made tens of thousands of dollars by falsifying overtime. ▮▮▮ ▮ conducted an investigation, and put a loss figure in their report. Following the investigation, ▮▮▮▮ cited ▮▮▮ for policy violations, suspended him for approximately 15 days, and removed him from the ▮▮ ▮▮▮. ▮▮▮ was also prohibited from working the ▮▮▮▮▮▮▮. ▮▮▮ believed ▮▮▮ should have been fired.

▮▮▮▮ was upset that ▮▮▮ was kicked out of the ▮▮▮ because they were friends and he wrote a lot of tickets, which generated significant income for the city. ▮▮▮▮ contacted ▮▮▮ numerous times on behalf of ▮▮▮ to advocate for his reinstatement. ▮▮▮ told ▮▮▮ that it appeared ▮▮▮▮ wanted him back on the ▮▮▮, so he would be allowed to work the ▮▮▮▮▮, but would not be placed back in the ▮▮▮▮▮.

In 2017, ▮▮▮▮ sent ▮▮▮ an e-mail regarding ▮▮▮'s slot in the ▮▮▮▮▮, suggesting ▮▮▮ be put back on. ▮▮▮ picked someone else. Later, ▮▮▮ applied for another open ▮▮▮▮▮ position. ▮▮▮▮ again recommended to ▮▮▮ that ▮▮▮ be put back on.

FD-302a (Rev. 05-08-10)

194C-DE-2179366-TAYLOR

Continuation of FD-302 of   (U)  Interview of ▮▮▮▮▮▮   ,On   09/20/2018   , Page   5 of 6



▮▮▮▮ told ▮▮▮▮ he would have to order her to put ▮▮▮ back on the ▮▮▮ ▮▮▮ went around ▮▮▮ to the ▮ ▮▮▮ who placed ▮▮▮ back on the ▮▮▮ **(Agent Note:▮▮▮ is presently the ▮▮▮ He was made acting ▮▮▮ in July 2017 and ▮▮▮ in November 2017.)**

▮▮▮▮ also got involved with personnel matters related to other officers. In one instance, ▮▮▮▮ believed some ▮▮▮▮▮▮ should have been fired after an excessive force incident. In many cases ▮▮▮▮ did not consider ▮▮▮▮'s involvement inappropriate. In ▮ s case she did.

▮▮▮▮ informed ▮▮▮ of ▮▮▮ s misconduct in a phone call. ▮▮▮ told ▮▮▮ that it sounded like ▮▮▮ should be fired. ▮▮▮ asked ▮▮▮ not to tell ▮▮▮ about the investigation of ▮▮▮

There was an article in the Detroit Free Press or Detroit News referencing who was the biggest recipient of ▮▮▮ s campaign donations. The paper missed ▮▮▮ but he would have been the biggest in the state. ▮▮▮ made donations before and after the campaign.

During the ▮▮▮ and ▮▮▮ investigations, many people thought that City Hall would be hit by the FBI.

When ▮▮▮ came aboard, it was clear he would associate with anyone for campaign donations. ▮▮▮ told ▮▮▮ that he was here to get the mayor reelected. There is a cigar bar in Detroit where ▮▮▮ had fundraisers.

▮▮▮ s concrete company would often be the low bid on contracts with the City of ▮▮▮ but would make up the money on big cost overruns.

▮▮▮ didn't donate to the mayor because he didn't want the perception that he was participating in pay-to-play.

▮▮▮ had never heard of another corporal partying with city officials like ▮▮▮

▮▮▮ was also tight with ▮▮▮ and ▮▮▮ ▮▮▮ is currently in Italy with ▮▮▮

▮▮▮ was in Brownstown, Michigan and she saw ▮▮▮ eating lunch with ▮▮▮

FD-302a (Rev. 05-08-10)

194C-DE-2179366-TAYLOR

Continuation of FD-302 of  (U)  Interview of ▮▮▮▮▮▮▮▮▮ , On  09/20/2018 , Page  6 of 6



▮▮▮▮ has never been promoted because he can't pass the ▮▮▮▮▮

▮▮▮▮▮ is very friendly with ▮▮▮▮▮

▮▮▮▮ went to Las Vegas with ▮▮▮▮▮▮▮▮ and ▮▮▮▮ in 2016. ▮▮▮▮ knew about this trip because ▮▮▮ accidentally printed the boarding passes to the printer in ▮▮▮▮▮ s office. He went again after she retired. He also went earlier this year with the same group.

▮▮▮▮▮ stated that ▮▮▮▮▮ was ruthless and would slit your throat and smile at you.

FD-302 (Rev. 5-8-10)

OFFICIAL RECORD
Document participants have digitally signed.
All signatures have been verified by a
certified FBI information system.

## FEDERAL BUREAU OF INVESTIGATION

Date of entry _____ 04/30/2013

██████████████ date of birth ██████ owner of ██████████ telephone number ████████ ██████████ cellular telephone number ████████ was interviewed at the office of his attorney, ██████████████████████ Also present were ██████████████████████ After being advised of the identity of the interviewing Agent and the nature of the interview, Anders provided the following information:

████████ met ████████ at a local political fundraising event. The two also belonged to a country club on ████████ where he and ██████████ He eventually became involved with ████ 's business, ████, first as a consultant. ██████ was looking to expand ██████ 's ██████████ ██████████ business. ██████ had a number of contacts with law enforcement that ████ believed would be beneficial in accomplishing this. ██████ said his compensation in this arrangement would be through commission. ██████ created a limited liability corporation (LLC), ████████ ██████████ for this purpose. ██████ had multiple sides to the business, with the ████ installations being pursued on what ██████ referred to as the security side. ██████ said there were few ████ installations sold, but income was realized through maintenance agreements from which ██████ would be paid a portion. ██████ estimated he had received approximately $100,000 in income since the initiation of his arrangement with ██████.

██████ and ████, won a bid to install ████ equipment at the ████ ██████████ sold the contract by promoting the fact ██ would receive a return on the price of the installation within 1-2 years by eliminating employee positions. ██████ financed the cost of the contract over 5 years. After ██ paid off the cost of the contract, ██████ entered into a maintenance agreement of which a percentage was paid to ██ This contract was entered into in approximately 2004.

██████ was introduced to ██████████████ by ████████. In 2004, ██████ began working with lobbyist ██████████, who he had met at an event for ████ during ████ 's Presidential campaign, to secure more business opportunities in ██ and the City of Detroit.

---

Investigation on  04/25/2013  at  Detroit, Michigan, United States (In Person)

File #  194B-DE-106370-████    194B-DE-106370-████                        Date drafted  04/29/2013

by  Kyle Albert

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.



FD-302a (Rev. 05-08-10)

194B-DE-106370-█████████

Continuation of FD-302 of ███████████████████████████████████████████ , On  04/25/2013 , Page  2 of 5

████████ went on an inspection of the ████████████████ and was appalled at the overcrowding. ████████ reported on these conditions to ████████ and said he wanted to initiate a proposal that would alleviate the overcrowding.  At the time, the practice of ████ was to release prisoners un-tethered. ████████ said ████ has received approximately $400,000 as its share through ████████ 's contract for tether monitoring, but has received nothing in the past three years due to the reduction in ████████ 's contract. The company is not receiving revenue in an amount sufficient to meet operating expenses.

████████ was originally hired to obtain work in the City of Detroit for ████████████ It was through ████ that ████████ was introduced to ████████████████ and ████████. ████████ was paid a retainer of $3,000 a month for 1 and 1/2 years.  In 2006, ████████ was called to a meeting at ████ ' office.  ████████ advised ████████ to close up his operation in Detroit and leave the city, further stating that ████████████████ and his associates were "going to jail" and there was no point in any further effort to obtain business in Detroit.  In 2008, ████ called ████████ to tell him ████████████ had been indicted.

████████ had developed a model of security distribution for ██  As part of his ideas, he proposed a periodic technical review to ensure the most up to date equipment and methods were being used.  The old way of doing business in ██ was to award a security contact to a company that used the same products during the term of their contract, no matter how long the period of time the contract was in effect. ████████████████████ agreed with ████████ that if prisoners were being released from the jail, they should be released on a tether. ████████ also wanted the most up to date technology employed in the program.

The first bid for a tethering contract was made in 2004, which was for a pilot program.  In 2005, ████████ bid on a 3 year contract, that allowed for 3, 1 year extensions. ████████ said he continued to pay ████ company, ████████████, as a lobbyist for ██. ████████ was the only distribution company that submitted a bid on the contract.  All other organizations submitting bids were companies that manufactured tethering equipment. ████████████████████████ became ████████████████ and contacted ██████, telling him he was getting pressure from Sheriff's Department retirees and their union to use certain tethering equipment.  This occurred in 2008. ████████ said many Sheriff's Department retirees are involved in tethering or tethering equipment businesses and want the jails to use their equipment.  One of the owners of █████████████████, ████████, is retired from the ████████████████ and is partnered in ████ with one or more of the ████████████████ asked ████ and ████ to sit down with ████████ and his group and review their product. ████████████████ from the

FD-302a (Rev. 05-08-10)

194B-DE-106370-█████

Continuation of FD-302 of ███████████████████████████████████ , On  04/25/2013 , Page  3 of 5



█████████████ was involved in financing █ s operation. ██████ said █
█████ a ███████████, was also involved. ██████ was always looking for a promotion or a better position and was frequently denied by █████.

████████ said he met with ████████ and asked him to give █████ one of the tethers, which was to monitor alcohol consumption, so that █████ could test its functionality. ██████ told ████████ that if the product worked and the price was right, perhaps a deal could be negotiated. ██████████ of █████ ran tests on the tether and told █████ and ██████ the product "was junk" and did not function satisfactorily. █████████ informed ████████ that his product was not good and ████████ was told █████ would not be using the tethers.

████████ left WC, and ████████████████████████████████████████ was installed as ██████████████████████ ██████ invited ████ to the NAACP golf outing and ██████ then requested █████ attend with him. ████████████████████████████ golfed as a foursome during the event. Between holes, ██████ recited the dollar amount of █████ s contracts with WC, and tells him to meet with ████████. █████ says █████ can work out █████ s "issues" to which █████ replied he wasn't aware there were any issues to work out. ██████ then changed the cart he was riding in to have a conversation with █████. █████████ and ██████ were in the same car and driving home from the golf outing. ██████ told ██████ about the conversation involving █████. ██████ then told █████ that █████ had asked █████ about a job for █████ 's wife with mention made of an $80,000 salary. ████████ tells █████ to 'call someone" about these matters. ██████████ called ██████████████████████. ████████ said he knew ████████ prior to this, and believed ████████ would protect █████ from solicitations by █████████.

Around this time period, a █ political event had been scheduled at the Roostertail, and a sponsor had cancelled. ████████ was asked to fill in for this sponsor at a cost of $5,000. ████████ set up a meeting with ████████ and █████ during which █████ was told this.

████████ said he was driving back from a meeting in Lansing when he received a call on his cell phone. He could see from the caller ID information that the call was from █████ During the call he received a second call from █████████. ██████ said █████ was furious with █████ ██████ told █████ he was on a call with ████████ and he patched █████ into the call so she could listen. █████████ was upset that ████████ had gone to ████████ and brought up what █████ said about █████████ hiring both █████ s wife and ████████████ told █████ that ████████ was not to make demands like he did. ██████ later called ████████ and asked him why ████████ "threw him under the bus".

FD-302a (Rev. 05-08-10)

194B-DE-106370-█████

Continuation of FD-302 of ██████████████ , On 04/25/2013 , Page 4 of 5



██████ said just prior to the issuance of a new RFP in September of 2009 for tethering, ████████ came to ████ office in █████ █████ had dealt with ████ on obtaining tickets to sports events prior to this contact and originally met him through ████████ █ said he needed a $3,000 loan for a short term. ████ said he was getting married and needed to make a down payment on his wedding reception. ██████ agreed to the loan and gave ████ $3,000 cash which he took out of cash he had on hand in the office. ██████ stated at the time that he preferred to receive the amount in cash. ██████ did not want to write a check as he did not want his wife to see that the payment had been made. ████ said he had requested a hardship loan from ██ from his ████████████ and when he received the amount he would pay ███ back. A month later, ████ called ██████ and told him his hardship loan request had been denied. ████████ had reached out to ████ at various times inquiring about getting repaid but has thus far been unsuccessful.

██████ said he got fed up with matters at ███ and quit attending events. ██████ hired ██████████ who had previous worked in the ██████████ █████████, to represent the company before ██ ██ advised █████ and ████████ not to write contribution checks or attend any ██ events while their contracts were being considered. ████████ said █████████ gave him and ████████ complimentary tickets to the ██████ Gala during one of these periods. Other bidders on the same RFP that ██████ was being considered under were attending County events.

████████ advised he sits on a legislative committee for the Michigan Towing Association. He was in Lansing attending meetings and during an evening meal he was seated across from State Representative ██████████ ██████ was visibly intoxicated and tells ██████ that his tethering contract is up for bid. ██████ would leave the table to make a telephone call. ████████ believed he may have been speaking with ██████ who was providing him the contract and bidding information. ████████ said the time period this occurred was around 2009, and could have coincided with the State of the State address. Early the following morning ██████ received a call from ██████████, who said he had spoke to █████████████ who ██████ said was a lobbyist who ████ thought was associated with ████████████████████ in Lansing. ██████ said ██████████ was close to the ████████ who run ████████████ and are associated with ████████████████ was saying his clients had been promised the contract.

When the contracts were announced, ████████ was the winning bid, with ██████ finishing second. ████████ was already doing business with the State of Michigan. After the bids were announced, ████████ submitted a letter to the ███ requesting that the contract be divided and awarded to four

FD-302a (Rev. 05-08-10)

194B-DE-106370-█████

Continuation of FD-302 of _____ , On  04/25/2013 , Page  5 of 5

companies, stating it was necessary to do so to have the proper coverage of services. █████ believes this was done in order to include █████████ and ██████████ ,, the bidders that finished third and fourth in the awarding. Without ███████ writing the letter, █████████ would have been awarded 100% of the contract. ████████ took ███████ aside during a public safety hearing that was held regarding the contract. █████████ told ██████ that because of ██████ complaining to ██████████ , █████████ was going to lose.

████████ was eventually terminated by ███████. █████ did have a relationship with █████████ , who is in an administrative position at the █████ , but █████ doesn't believe ███ and ████ actively worked against █████████████████ and ██████████ were always present to represent the ██████████████ at █████████ was being paid $1,500 a month which was must less than what lobbyists are usually paid. █████████ would have preferred that ████████ allow ███████ to speak with ███ and tell her that her services would no longer be used. But ████████ wrote a negative letter to ████ that made the matter very contentious. ████████ said ███ is still employed by ████████████.

████████ was asked about matters in the City of █████. ████████ said █████ gets a new Mayor every four years. ████████ always attends the Mayor's golf outing and is supportive of whoever holds the office. He has a $1 million investment in his facility in the city and provides towing and storage services and developed a program to save ██████ on unproductive administrative costs. During a recall of ████████████ , former ███████████████████ was supported by █████████████ , owner of █████████ in Romulus, and a competitor of ██████. ████████ said ██████ became █████████ when he defeated ███████████████████ left office when he was defeated by ██████████████ was told by a ████████████ that █████████ offered to fund the cost of the recall of ███████ if he was promised the towing contract. ████████ mentioned the local media story by ███████████ in which ██████████████████ was quoted. It involved the story of a women who was unable to retrieve her car from ███████████ lot on Good Friday.

████████ said he would provide a copy of the letter by ██████████ to the ██████ 's correspondence with the ████ and recent event invitations ████ has received.

FD-302 (Rev. 5-8-10)

-1 of 1-

OFFICIAL RECORD
Document participants have digitally signed.
All signatures have been verified by a
certified FBI information system.

## FEDERAL BUREAU OF INVESTIGATION

Date of entry    05/07/2013

███████████ who has been previously interviewed by the investigating Agent, advised he had documents that had been requested previous ready to provide to the FBI. ███████ also provided the following information:

███████ advised he had a conversation with ███████████ who had discussed the lack of tethers ███████ had been assigned in recent weeks with ███████████ ███████ stated he did not care about the politics involved in the issue and had directed ███████████ to give ███████ their "fair share" of tethers. ███████ said ███████ was down to monitoring 40 tethers, but had received 11 tethers in the last week.

███████believes that persons from ███████████may be advising ███████ that ███████may not be with the ███████████much longer, and to ignore ███████'s directives. Both ███████'s and ███████'s contracts, now with ███████, will likely not be approved for extension by the ███████████ ███████

Investigation on  05/01/2013  at  Detroit, Michigan, United States (Phone)

File #  194B-DE-106370

Date drafted  05/07/2013

by  Kyle Albert

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302 (Rev. 5-8-10)

-1 of 1-

**FEDERAL BUREAU OF INVESTIGATION**

OFFICIAL RECORD
Document participants have digitally signed.
All signatures have been verified by a
certified FBI information system.

Date of entry ___06/21/2013___

███████████ met with the investigating Agent at ██████ place of business, ███████████████████████████████████████ █████ provided the following information:

████ said he advised ██████████████████ not to attend the ████ ████████████████ meeting regarding the tether contracts at the █. ██████ believes it is an issue between ██ and █████████████, the company that has gone over the allotment allowed in its contract with ██ to the detriment of ██████. ██████ said █████████████ has an interest in ██, along with the █████████████. The Registered Agent is listed as ████████████. Prior to ██████, the Registered Agent was ██████████ ████████████████████. The ████████ also operate ██████ and ████████████████████

██████ wanted to provide copies of invitations he has received over the past 3-4 years related to fundraising activities by █████████████ ████ and ████████████████████. These copies were scanned and made an attachment to this communication.

Investigation on ___05/24/2013___ at ___Taylor, Michigan, United States (In Person)___

File # ___194B-DE-106370-WCSD___                                    Date drafted ___06/21/2013___

by ___Kyle Albert___

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.